**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-4718
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

RUBEN MITCHELL

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court Criminal No. 09-cr-105)
District Judge:  Honorable David Stewart Cercone
_____

Argued February 23, 2011

Before: MCKEE, *Chief Judge*, SLOVITER, SCIRICA,
RENDELL, BARRY, AMBRO, FUENTES, SMITH,
FISHER, CHAGARES, JORDAN, HARDIMAN,
GREENAWAY, JR., and VANASKIE, *Circuit Judges*.

(Opinion Filed:  July 25, 2011)

Laura S. Irwin, Esq. **(ARGUED)**
Office of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
    *Attorney for Appellant*

John A. Knorr, Esq.
Suite 1204
437 Grant Street
Frick Building
Pittsburgh, PA 15219
    *Attorney for Appellee*

Elisa A. Long, Esq. **(ARGUED)**
Lisa B. Freeland, Esq.
Office of the Federal Public Defender
1500 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222
    *Attorney for Amicus Curiae Office of the Federal*
    *Public Defender – Appellee*

Will W. Sachse, Esq.
Dechert LLP
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Witold J. Walczak, Esq.
Legal Director, ACLU of Pennsylvania
313 Atwood Street

Pittsburgh, PA 15213
      *Attorneys for Amicus Curiae American Civil Liberties*
      *Union – Appellee*

Kevin S. Bankston, Esq.
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 9411
      *Attorney for Amicus Curiae Electronic Frontier*
      *Foundation – Appellee*

Jonathan S. Franklin, Esq.
Tillman J. Breckenridge, Esq.
Mark T. Emery, Esq.
Fulbright & Jaworski, L.L.P.
810 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
      *Attorneys for Amicus Curiae DNA Saves – Appellant*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*, with whom Circuit Judges SLOVITER, SCIRICA, SMITH, FISHER, CHAGARES, JORDAN, and HARDIMAN, join, and AMBRO joins as to Part III only.

Ruben Mitchell was indicted on one count of attempted possession with intent to distribute cocaine. Following Mitchell's indictment, arrest, and detention, the

3

Government sought to collect a DNA sample. The Government relied on 42 U.S.C. § 14135a(a)(1)(A), which permits the collection of DNA samples from "individuals who are arrested, facing charges, or convicted." Mitchell objected, arguing that the statute violated the Fourth Amendment. Agreeing with Mitchell, the District Court concluded that the statute was unconstitutional and prohibited the Government from taking a DNA sample from Mitchell prior to conviction.

As a threshold matter, we address whether we possess appellate jurisdiction over this interlocutory appeal by the Government. We conclude that this appeal falls within the narrow class of orders immediately appealable under the collateral order doctrine enunciated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949). Turning to the merits, we apply a "totality of the circumstances" test, balancing the intrusion on Mitchell's privacy against the Government's interest in the collection and testing of his DNA. *United States v. Knights*, 534 U.S. 112, 118–19 (2001). As arrestees have a diminished expectation of privacy in their identities, and DNA collection from arrestees serves important law enforcement interests, we conclude that such collection is reasonable and does not violate the Fourth Amendment. Accordingly, we will reverse.

## I.

Mitchell was indicted on a single count of attempted possession with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846. Thereafter, he was arrested and placed in pretrial detention. At Mitchell's initial appearance before a Magistrate Judge, the Government

4

sought to collect a sample of Mitchell's DNA[1] pursuant to 42 U.S.C. § 14135a(a)(1)(A)[2] and its implementing regulation, 28 C.F.R. § 28.12. The statute, as amended in 2006, permits the collection of DNA samples from "individuals who are arrested, facing charges, or convicted." 42 U.S.C. § 14135a(a)(1)(A). Mitchell objected, arguing that the statute violated the Fourth Amendment; the Magistrate Judge ordered briefing and stayed the collection of Mitchell's DNA pending resolution by the District Court. Prior to the resolution of the DNA issue, the District Court held a detention hearing and detained Mitchell pending trial.

In a Memorandum Opinion, the District Court held that § 14135a(a)(1)(A) and its implementing regulation violate the Fourth Amendment insofar as they permit the warrantless collection of DNA from individuals who have not been convicted of a crime. Applying a "totality of the circumstances" analysis, the District Court assessed "'on the one hand, the degree to which [the DNA collection] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Samson v. California*, 547 U.S.

---

[1] "DNA stands for deoxyribonucleic acid. DNA molecules carry the genetic information of human beings. DNA is unique to each individual, except in the case of identical twins." *United States v. Sczubelek*, 402 F.3d 175, 181 n.2 (3d Cir. 2005).

[2] Section 14135a was enacted as part of the DNA Analysis Backlog Elimination Act of 2000. We will refer to this Act and all subsequent versions of the statute as the "DNA Act."

843, 848 (2006) (quoting *Knights*, 534 U.S. at 118–19). Considering Mitchell's status as an arrestee and a pretrial detainee, the District Court held that "Mitchell has a diminished expectation of privacy in his identity" and thus may be subjected to routine booking procedures such as fingerprinting. *United States v. Mitchell*, 681 F. Supp. 2d 597, 608 (W.D. Pa. 2009). Nevertheless, the District Court declined to equate "the fingerprinting process and the resulting identification information obtained therefrom with DNA profiling" given "the complex, comprehensive, inherently private information contained in a DNA sample." *Id.* "The extraction of DNA," the District Court reasoned, "is much more than a mere progression [from] taking fingerprints and photographs[;] it represents a quantum leap that is entirely unnecessary for identification purposes." *Id.* at 608–09. As a result, the District Court concluded that while taking the DNA sample "may not be unreasonably intrusive, the search of the sample is quite intrusive, severely affecting Mitchell's expectation of privacy in his most intimate matters." *Id.* at 609.

With respect to the Government's interests, the District Court determined that there was no compelling need to take Mitchell's DNA sample for identification purposes. While collecting DNA also serves investigative purposes, "there [was] no exigency that support[ed] the collection of DNA from an arrestee or pretrial detainee" as opposed to waiting until after a conviction or obtaining a proper search warrant. *Id.* at 610. Accordingly, weighing Mitchell's privacy interests against the Government's legitimate interests, the District Court concluded that the universal collection of DNA samples from arrestees and pretrial detainees was unreasonable and thus violated the Fourth Amendment. In

6

the accompanying Order, the District Court prohibited the Government from collecting a DNA sample from Mitchell "until such time as he has been convicted of the offense set forth in the indictment." *Id.* at 611. The Government sought reconsideration, which was denied.

The Government timely appealed and expressed an interest in expediting the appeal. We ordered the parties to address both the request to expedite and the jurisdictional basis for the appeal in their motion and response.[3] Following the parties' submissions, we granted the Government's request to expedite and directed the parties to address the issue of our subject matter jurisdiction in their merits briefs. A three-judge panel heard oral argument; however, while the case was under consideration, it was determined that the case should be heard en banc pursuant to Third Circuit Internal Operating Procedure 9.4.1.

This appeal presents two issues: (1) whether the District Court's decision is immediately appealable under the collateral order doctrine, and, if so, (2) whether the collection

---

[3] Mitchell was originally represented by the Federal Public Defender ("FPD"). On November 19, 2010, the District Court granted the FPD's motion to withdraw as counsel and issued an order appointing attorney John A. Knorr to represent Mitchell. Subsequently, this Court also terminated the FPD's representation and appointed Knorr to represent Mitchell on appeal. We then appointed the FPD as amicus curiae on the basis that the issues in the case had the potential to affect other defendants.

of DNA from arrestees and pretrial detainees violates the Fourth Amendment.

## II.

The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. Mitchell contests our jurisdiction. "We necessarily exercise *de novo* review over an argument alleging a lack of appellate jurisdiction."[4] *Reilly v. City of Atlantic City*, 532 F.3d 216, 223 (3d Cir. 2008). Our standard of review of the District Court's resolution of Mitchell's Fourth Amendment claim is likewise *de novo*. *United States v. Sczubelek*, 402 F.3d 175, 178 (3d Cir. 2005).

## III.

Mitchell asserts that we cannot exercise jurisdiction over the present appeal by the Government. He argues first that the Government lacks statutory authority under the Criminal Appeals Act, 18 U.S.C. § 3731, to appeal from the District Court's adverse ruling in this criminal case. Second, he contends that this appeal does not fall within the collateral order doctrine. We address each of Mitchell's arguments in turn.

### A. Criminal Appeals Act

Mitchell correctly cites the well-established rule that "'an appeal by the prosecution in a criminal case is not

---

[4] To the extent that we have jurisdiction, we exercise it under 28 U.S.C. § 1291.

favored and must be based upon express statutory authority.'" *United States v. Farnsworth*, 456 F.3d 394, 399 (3d Cir. 2006) (quoting *United States v. Gilchrist*, 215 F.3d 333, 335– 36 (3d Cir. 2000)). In general, the United States may appeal in a criminal case only as permitted by the Criminal Appeals Act, 18 U.S.C. § 3731, which limits appeals to cases involving the dismissal of charges, suppression or exclusion of evidence, return of seized property, or release of a defendant.[5]

Neither party argues that the present appeal falls into one of the categories of orders appealable pursuant to § 3731. Mitchell contends that this alone resolves the question and strips us of jurisdiction. The Supreme Court has concluded to the contrary, however, holding that in certain limited instances, "orders relating to a criminal case may be found to possess sufficient independence from the main course of the prosecution to warrant treatment as plenary orders, and thus be appealable on the authority of 28 U.S.C. § 1291 without regard to the limitations of 18 U.S.C. § 3731." *Carroll v. United States*, 354 U.S. 394, 403 (1957). In other words, while the Government must have express statutory authority to appeal in a criminal case, there are two statutes that provide this authority: (1) 18 U.S.C. § 3731, for a circumscribed list of orders; and (2) 28 U.S.C. § 1291, for collateral orders. The appeal of a collateral order by the Government is thus an exception to the strictures of § 3731. *See United States v. Ferri*, 686 F.2d 147, 150–52 (3d Cir. 1982) (examining whether jurisdiction was proper under the collateral order doctrine of § 1291 after the Government

---

[5] The Government may also seek appellate review of a sentence as delineated in 18 U.S.C. § 3742.

9

conceded that jurisdiction was lacking under § 3731); *United States v. Moussaoui*, 483 F.3d 220, 227 (4th Cir. 2007) (same); *United States v. Peterson*, 394 F.3d 98, 103 (2d Cir. 2005) (deciding whether "the appeal is sufficiently independent from [the defendant's] underlying criminal case to make it one of the few criminal appeals permitted under section 1291"); *United States v. Horn*, 29 F.3d 754, 768 (1st Cir. 1994) (holding that "under what we choose to call the 'special circumstance' exception, a government appeal may be entertained in a criminal case on the authority of section 1291 if the appeal satisfies the conditions of the so-called collateral order doctrine"). This authority makes clear that even though the challenged order is not appealable under § 3731, the Government may still maintain this appeal if the order qualifies as collateral.

## B. Collateral Order Doctrine

The final judgment rule of 28 U.S.C. § 1291 limits the jurisdiction of the courts of appeals to review of "final decisions of the district courts." Section 1291 "[o]rdinarily . . . 'prohibits appellate review until conviction and imposition of sentence' in a criminal case." *United States v. Wecht*, 537 F.3d 222, 228 (3d Cir. 2008) (quoting *Flanagan v. United States*, 465 U.S. 259, 263 (1984)). In *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949), the Supreme Court applied a "practical rather than a technical construction" to § 1291 and carved out a narrow exception to the final judgment rule, which has come to be known as the collateral order doctrine. This exception deems as "final judgments" those decisions that, while they do not end the litigation on the merits, "finally determine claims of right separable from, and collateral to, rights asserted in the action,

too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* Thereafter, in *Carroll*, 354 U.S. at 403, the Supreme Court held that the collateral order doctrine was applicable in criminal cases to orders "possess[ing] sufficient independence from the main course of the prosecution."

"To come within the 'small class' of decisions excepted from the final-judgment rule by *Cohen*," an order must (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978); *accord Sell v. United States*, 539 U.S. 166, 176 (2003) (applying the *Cohen* test in a criminal case); *Wecht*, 537 F.3d at 228. All three of these requirements must be met for an order to qualify as collateral. *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 324 (3d Cir. 1999).

We have "consistently construed the collateral order exception narrowly lest the exception swallow up the salutary general rule that only final orders be appealed. Moreover, strict construction of the collateral order doctrine is consistent with the longstanding congressional policy against piecemeal appeals that underlies the final judgment rule." *Id.* at 324–25 (internal quotation marks & citations omitted). In criminal cases, "[b]ecause of the compelling interest in prompt trials, the [Supreme] Court has interpreted the requirements of the collateral-order exception to the final judgment rule with the utmost strictness in criminal cases." *Flanagan*, 465 U.S. at 265; *accord Gov't of the V.I. v. Rivera*, 333 F.3d 143, 150

11

n.16 (3d Cir. 2003). To be appealable under the collateral order doctrine, a pretrial order in a criminal case must involve "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Flanagan*, 465 U.S. at 265 (internal quotation marks & citations omitted).

As the Supreme Court has instructed, "[t]o guard against the temptation to expand the doctrine's reach, . . . 'the issue of appealability under § 1291 is to be determined for the entire category to which a claim belongs.' This approach reflects the Court's insistence that the finality requirement of § 1291 must not be reduced to a case-by-case determination . . . ." *We*, 174 F.3d at 325 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)) (further citation omitted); *accord Mohawk Indus., Inc. v. Carpenter*, --- U.S. ---, 130 S. Ct. 599, 606–09 (2009) (declining to classify disclosure orders adverse to the attorney-client privilege as collateral in part because the interest protected by the privilege did not "justify the cost of allowing immediate appeal of the entire class of relevant orders"). As the Supreme Court recently stated:

> The justification for immediate appeal must . . . be sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes. This requirement finds expression in two of the three traditional *Cohen* conditions. The second condition insists upon *important* questions separate from the merits. More significantly, the third *Cohen* question, whether a right is adequately vindicable or effectively reviewable, simply cannot be answered without

12

a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement. That a ruling may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment . . . has never sufficed. Instead, the decisive consideration is whether delaying review until the entry of final judgment would imperil a substantial public interest or some particular value of a high order.

*Mohawk*, 130 S. Ct. at 605 (internal quotation marks & citations omitted).

The first requirement of the collateral order doctrine is that the order must "conclusively determine the disputed question." *Coopers & Lybrand*, 437 U.S. at 468. "We cannot review any decision that is 'tentative, informal, or incomplete.'" *Wecht*, 537 F.3d at 230 (quoting *Cohen*, 337 U.S. at 546). Both parties agree that the District Court's Orders granting Mitchell's motion and denying the Government's motion for reconsideration conclusively determined a disputed question.

The parties, however, contest the scope and phrasing of the disputed question, a disagreement that ultimately does not affect our conclusion as to whether the first element of the *Cohen* test is satisfied. According to Mitchell, the Government "mischaracterizes the issue in this appeal too broadly and obscures the right at stake when it says that 'the disputed question [is] whether § 14135a(a)(1)(A) . . . comport[s] with the Fourth Amendment and thus whether Mitchell[,] as a pre-trial detainee, has a legal right to avoid

13

forced collection of a DNA sample.'" (Mitchell Br. 15 (quoting Gov't Br. 13).) Mitchell's argument is correct insofar as the precise issue at stake is actually the *Government's authority* to collect a DNA sample from a pretrial detainee under federal law and not *Mitchell's right* to be free from such collection. But this is a distinction without a difference. Ultimately, the District Court concluded that "42 U.S.C. § 14135a, and its accompanying regulations, requiring a charged defendant to submit a DNA sample for analysis and inclusion in [the Combined DNA Index System][6] without independent suspicion or a warrant[,] unreasonably intrude[] on such defendant's expectation of privacy and [are] invalid under the Fourth Amendment." *Mitchell*, 681 F. Supp. 2d at 611. Thus, the District Court conclusively determined that § 14135a violates the Fourth Amendment insofar as it permits the collection of a DNA sample from an arrestee or a pretrial detainee. Moreover, it denied the Government's motion for reconsideration, confirming that the District Court does not intend to further address the constitutionality of the DNA Act with respect to arrestees and pretrial detainees. *See Wecht*, 537 F.3d at 230 n.14; *United States v. Whittaker*, 268 F.3d 185, 192 (3d Cir. 2001) (holding that order was conclusive when "there [was] no possibility . . . that, depending upon future events, the district court might reconsider its position").

Ultimately, the District Court conclusively decided a question of constitutional law. The District Court prohibited the Government from exercising its authority pursuant to § 14135a and its implementing regulation to collect a DNA

---

[6] Throughout this opinion we will also refer to the "Combined DNA Index System" by its acronym, CODIS.

14

sample from Mitchell because, in the court's view, such collection would violate Mitchell's Fourth Amendment rights. As such, the orders at issue here satisfy the first requirement of the collateral order doctrine.

The second requirement is that the order "resolve an important issue completely separate from the merits of the action." *Coopers & Lybrand*, 437 U.S. at 468. "This is sometimes divided into two sub-requirements: (a) the issue must be important; and (b) the issue must be completely separate from the merits of the action." *Wecht*, 537 F.3d at 230. With respect to the first sub-requirement, "[t]he Supreme Court has defined an important issue as one involving interests that are weightier than the societal interests advanced by the ordinary operation of final judgment principles or one that is serious and unsettled." *Id.* at 230–31 (internal quotation marks & citations omitted); *accord Pierce v. Blaine*, 467 F.3d 362, 370–71 (3d Cir. 2006) ("[A]n issue is important if the interests that would potentially go unprotected without immediate appellate review are significant relative to efficiency interests sought to be advanced by adherence to the final judgment rule." (internal quotation marks & citation omitted)). In other words, the issue must be "important in a jurisprudential sense." *Christy v. Horn*, 115 F.3d 201, 205 (3d Cir. 1997) (citing *Praxis Props., Inc. v. Colonial Sav. Bank*, 947 F.2d 49, 56 (3d Cir. 1991)).

It is true, as Mitchell argues, that in many criminal cases holding that interlocutory review was warranted, the important issue at stake involved the rights of the defendant. *See, e.g.*, *Sell*, 539 U.S. at 176 (concluding that defendant's right to avoid forced medication is important); *Abney v.*

15

*United States*, 431 U.S. 651, 659 (1977) (concluding that defendant's right to avoid trial on double jeopardy grounds is important). Yet other cases have held that interests asserted by the Government or by the public at large are sufficiently important to merit interlocutory review. *See, e.g.*, *Whittaker*, 268 F.3d at 192 (order disqualifying United States Attorney for Eastern District of Pennsylvania); *United States v. Santtini*, 963 F.2d 585, 592 (3d Cir. 1992) (order prohibiting federal law enforcement agents from arresting subject of valid arrest warrant).

The interest asserted by the Government in the present case—exercising its statutory authority to collect a DNA sample from an arrestee or a pretrial detainee—is similarly important. Congress passed a statute permitting such collection, and the Attorney General promulgated regulations directing it. Vindicating the intent of Congress and the Attorney General can be jurisprudentially important. *Cf. Praxis Props.*, 947 F.2d at 56 (resolving meaning of federal statute jurisprudentially "important" under *Cohen*). Moreover, the Government's interest in conducting reasonable searches for law enforcement purposes and individuals' rights to be free from unreasonable searches, like issues of "involuntary medical treatment," "raise[] questions of clear constitutional importance." *Sell*, 539 U.S. at 176. Mitchell argues that the Government's interest in obtaining a DNA sample before trial is not sufficiently weighty as it is merely a matter of timing given that the Government will be able to collect Mitchell's DNA upon conviction. As we discuss in the following section, the interests implicated in

16

pretrial collection of DNA, however, are not fully satisfied through post-trial collection.[7]

The second sub-requirement, that the issue be completely separate from the merits, "derives from the principle that there should not be piecemeal review of issues that will later merge with the final judgment and thus require the court to review the same issue twice." *Santtini*, 963 F.2d at 592 (citing *Praxis Props.*, 947 F.2d at 56–57). The merits of the present action are Mitchell's guilt or innocence of the offense of attempted possession with intent to distribute five or more kilograms of cocaine. Whether the Government may collect Mitchell's DNA prior to conviction is entirely distinct from the underlying criminal prosecution.

---

[7] Mitchell further argues that the Government does not have an important interest in the pretrial collection of DNA samples as it "does not have the capacity to analyze DNA samples in a timely manner, as evidenced by the hundreds of thousands of DNA samples collected but not yet analyzed." (Mitchell Br. 21.) The report cited by Mitchell in support of this contention, however, discusses the backlog in analysis of DNA samples collected by the states in state and local laboratories and has no bearing on the FBI's analysis of samples collected from federal pretrial detainees. *See* U.S. Dep't of Justice, Office of the Inspector Gen., Audit Report No. 09-23, *Audit of the Convicted Offender DNA Backlog Reduction Program* i–iv (2009), *available at* http://www.justice.gov/oig/reports/OJP/a0923/final.pdf. Moreover, "the national backlog of convicted offender samples awaiting analysis [in state laboratories] has declined." *Id.* at viii.

The Second Circuit reached a similar conclusion in *United States v. Peterson*, 394 F.3d 98, 104–05 (2d Cir. 2005), a case that involved the collection of a DNA sample pursuant to conviction. After Peterson was released on probation, he received a letter from the United States Probation Office directing him to appear to submit a blood sample for DNA testing. 394 F.3d at 100–01. Peterson refused, arguing that his conviction was not a qualifying offense under the statute,[8] and the Government petitioned the district court to summon Peterson to a violation hearing. *Id.* at 101. The district court dismissed the petition, concluding that Peterson's offense was not a qualifying offense under the statute and that Peterson had not violated any conditions of probation. *Id.* On appeal, the Second Circuit held that it had jurisdiction to review the order dismissing the petition under the collateral order doctrine. *Id.* at 104–05. The court reasoned that the "determination that Peterson did not violate the terms of his probation had nothing to do with the merits of Peterson's criminal conviction. All the District Court decided was the purely legal question whether Peterson's conviction for bank larceny required him to submit to the collection of a DNA sample." *Id.* Furthermore, "[n]othing the District Court could have done in response to the government's petition would in any way have affected, or even called into question, the validity of Peterson's underlying conviction or the validity of the sentence imposed by the District Court." *Id.* at 105.

---

[8] Contested in *Peterson* was the version of the DNA Act that existed in 2002. The DNA Act has subsequently been amended to make "any felony" a qualifying offense. Pub. L. No. 108-405, 118 Stat. 2260, 2270 (Oct. 30, 2004).

In *Peterson*, the issue of whether the Government was permitted to take a DNA sample arose after his trial and conviction, whereas here, the question has been raised before trial. This difference in when the DNA was sought is, however, inconsequential in this case at least, because in both circumstances the legal issue "ha[s] nothing to do with the merits of" the criminal case. Accordingly, the challenged order is "'truly collateral.'" *Id.* (quoting *Abney*, 431 U.S. at 660).

Mitchell argues to the contrary, contending that the question of pretrial collection of his DNA "is inextricably tied to the merits of [his] prosecution" as the Government could use "the DNA as a crime-solving-prosecutory-tool in the case against [him]." (Mitchell Br. 25.) This argument, however, misconstrues the nature of the search at issue in this appeal. The statute and regulation pursuant to which the Government sought Mitchell's DNA allow for the suspicionless collection of DNA samples from arrestees and pretrial detainees for purposes of identification. Nothing in the record demonstrates that Mitchell's DNA will be an issue at trial or that the Government intends to compare Mitchell's DNA sample to DNA evidence collected from a crime scene. Moreover, if in fact, the present case did involve DNA evidence from a crime scene, and the Government wished to compare Mitchell's DNA to the DNA evidence left at the scene, it would have to obtain a warrant to collect Mitchell's DNA for purposes of comparing the two.[9] Instead, the

---

[9] In this respect, we disagree with the dissent's characterization of the Government's interest as using the DNA sample to "ascertain the defendant's identity as it relates to the guilt or innocence of the crime he is *currently*

Government seeks Mitchell's DNA sample as directed by 28 C.F.R. § 28.12, which mandates such collection from individuals who are arrested or facing charges. Whether the Government is constitutionally allowed to do so without suspicion is a question completely separate from the issue of Mitchell's guilt or innocence.

The third requirement of the collateral order doctrine is that the order must "be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand*, 437 U.S. at 468. The relevant inquiry is whether the issue presented is in "danger of becoming moot upon conviction and sentence." *Flanagan*, 465 U.S. at 266; *accord United States v. Fisher*, 871 F.2d 444, 449 (3d Cir. 1989). "[T]he decisive consideration is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk*, 130 S. Ct. at 605 (quoting *Will v. Hallock*, 546 U.S. 345, 352–53 (2006)).

As the Supreme Court has recently held, "[t]he crucial question . . . is not whether an interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk*, 130 S. Ct. at 606. The question presented in this appeal would clearly become moot upon final judgment. If Mitchell is convicted, the Government will be able to collect

---

being charged with." (Dissenting Op. at 9). Again, the identity of the arrestee, that is whether this person is actually Ruben Mitchell, is completely distinct from any questions of guilt or innocence.

his DNA pursuant to a different provision of the DNA Act, 42 U.S.C. § 14135a(a)(1)(B), which mandates collection from "each individual in the custody of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense." Possession with intent to distribute cocaine is a qualifying federal offense under the statute. *See id.* § 14135a(d)(1). Collection of DNA samples from convicted felons has been upheld as constitutional by every circuit court to have considered the issue. *See, e.g.*, *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008); *United States v. Conley*, 453 F.3d 674 (6th Cir. 2006); *United States v. Kriesel*, 508 F.3d 941 (9th Cir. 2007); *United States v. Weikert*, 504 F.3d 1 (1st Cir. 2007); *United States v. Amerson*, 483 F.3d 73, 78 (2d Cir. 2007); *Banks v. United States*, 490 F.3d 1178 (10th Cir. 2007); *United States v. Kraklio*, 451 F.3d 922 (8th Cir. 2006); *United States v. Hook*, 471 F.3d 766 (7th Cir. 2006); *Sczubelek*, 402 F.3d 175; *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411 (5th Cir. 2004) (per curiam). On the other hand, if Mitchell is acquitted, the Government will have no right to collect his DNA. In either case, the Government's statutory authority to collect DNA from an arrestee or a pretrial detainee would not be before the Court.

The Government has no other opportunity during the trial to seek to vindicate its statutory authority. Thus, the Government's interest in collecting DNA from pretrial detainees "is not adequately redressable on appeal after final judgment, regardless of the trial's outcome." *Wecht*, 537 F.3d at 229; *see also Whittaker*, 268 F.3d at 193 (holding that an order disqualifying an entire United States Attorney's Office

21

from prosecuting a criminal case is not effectively reviewable on appeal).[10]

Moreover, the Government's authority to collect DNA pre-trial is not adequately vindicated through post-conviction collection. In *Wecht*, we held that an order denying the media access to the names of prospective jurors was immediately reviewable as a collateral order. 537 F.3d at 227. We rejected the suggestion that post-trial release of such information would "vindicate the public's asserted right of access," reasoning that "[a]lthough post-trial release of information may be better than none at all, the value of the right of access would be seriously undermined if it could not be contemporaneous." *Id.* at 229. Thus, we concluded that "the value of contemporaneous disclosure, as opposed to post-trial disclosure, is significant enough to justify our immediate review of the matter under the collateral order doctrine." *Id.* Similarly, allowing the Government to collect a DNA sample from Mitchell post-trial would better serve the

---

[10] Mitchell cites *Mohawk* to argue that interlocutory review is inappropriate because the District Court's Order does not "so imperil[] the [G]overnment's interest in collecting [his] DNA so as to justify the cost of allowing the immediate appeal of a whole class of similar orders." (Mitchell Br. 24 (citing *Mohawk*, 130 S. Ct. at 605)) Even assuming that our decision would permit a whole "class" of orders relating to DNA collection to be subject to interlocutory review, these classes are ultimately circumscribed and would accord with our policy of allowing collateral order review in criminal cases only "sparingly." *Rivera*, 333 F.3d at 150 n.16. As such, collateral order review in the present case is consistent with *Mohawk*.

22

Government's interest than forbidding all such collection. Nevertheless, as will become clear in the following section, the value to the Government of pre-trial collection, rather than post-conviction collection, is sufficiently distinct to merit interlocutory review.

In sum, the District Court's Order prohibiting the pretrial collection of a DNA sample from Mitchell is subject to collateral order review. We are mindful of the Supreme Court's instruction in *Flanagan* that in criminal cases, "the requirements of the collateral-order exception to the final judgment rule [must be interpreted] with the utmost strictness." 465 U.S. at 265. At bottom, the *Flanagan* Court was concerned about the policy of finality, which "is at its strongest in the field of criminal law." *Id.* at 264 (quoting *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982)). Yet our decision to exercise immediate review does not harm the finality of Mitchell's criminal case. Regardless of the outcome of this appeal, Mitchell's trial will proceed unaffected. As the Supreme Court has held, "matters embraced in [a] trial court's pretrial order . . . are truly collateral to the criminal prosecution itself [when] they will not 'affect, or . . . be affected by, decision of the merits of th[e] case.'" *Abney*, 431 U.S. at 660 (quoting *Cohen*, 337 U.S. at 546); *see also United States v. Brown*, 218 F.3d 415, 422 (5th Cir. 2000) (exercising collateral review of a gag order, as such review would have no impact on the criminal trial). Accordingly, our exercise of jurisdiction over this appeal pursuant to the collateral order doctrine is consistent with the policy of finality.

**IV.**

23

## A. The DNA Act

The statute challenged by Mitchell is the latest and most far-reaching version of the DNA Act. In 1994, Congress passed the Violent Crime Control and Law Enforcement Act ("Crime Control Act"), Pub. L. No. 103-322, 108 Stat. 1796 (codified as amended at 42 U.S.C. §§ 13701–14223), which authorized the Federal Bureau of Investigation ("FBI") to establish an index of DNA samples. Pursuant to this authority, the FBI created the Combined DNA Index System ("CODIS"), which "allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system." H.R. Rep. 106-900(I), at 8 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2323, 2324.

Thereafter, in 2000, Congress enacted the DNA Act, which required the collection of a DNA sample "from each individual in the custody of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense" and from each "individual on probation, parole, or supervised release." Pub. L. No. 106-546, § 3(a)(1) & (2), 114 Stat. 2726, 2728 (codified as amended at 42 U.S.C. § 14135a(a)(1) & (2)). Pursuant to the DNA Act, "[t]he Attorney General, the Director of the Bureau of Prisons, or the probation office responsible . . . may use or authorize the use of such means as are reasonably necessary to detain, restrain, and collect a DNA sample from an individual who refuses to cooperate in the collection of the sample." 42 U.S.C. § 14135a(a)(4)(A). Moreover, "[a]n individual from whom the collection of a DNA sample is authorized under this subsection who fails to

24

cooperate in the collection of that sample shall be . . . guilty of a class A misdemeanor." *Id.* § 14135a(a)(5)(A). Once the DNA sample is collected, the collection kit is forwarded to the FBI for analysis and inclusion in CODIS. *Id.* § 14135a(b).

The DNA Act includes a number of safeguards to prevent the improper use of DNA samples. First, the Act explicitly restricts the use of DNA test results to the purposes specified in the Crime Control Act. *Id.* § 14135e(b). The Crime Control Act limits disclosure "to criminal justice agencies for law enforcement identification purposes;" "in judicial proceedings, if otherwise admissible;" "for criminal defense purposes, to a defendant, who shall have access to samples or analyses performed in connection with the case in which such defendant is charged;" and, "if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes." *Id.* § 14132(b)(3).

Second, pursuant to the DNA Act, "a[ny] person who knowingly discloses a sample or [DNA] result . . . in any manner to any person not authorized to receive it, or obtains or uses, without authorization, such sample or result" is punishable by a fine of up to $250,000 or imprisonment for a period of up to one year. *Id.* § 14135e(c). Moreover, each unlawful disclosure of the sample or result is punishable as a "separate offense." *Id.* Under the Crime Control Act, failure to comply with "the quality control and privacy requirements" can result in cancellation of access to CODIS. *Id.* §14132(c). In addition, the Crime Control Act requires the Director of the FBI to expunge the DNA record from

CODIS when a conviction is overturned or when, if the sample is taken following an arrest, the charge is dismissed or results in an acquittal or no charge is timely filed. *Id.* § 14132(d)(1)(A). Expungement requires that the FBI receive a certified copy of a final court order establishing the final disposition of the arrest or conviction. *See id.*

Additionally, two important Government policies that are not laid out in the statute provide protection against the improper use of the DNA profiles. The first of these relates to the type and amount of information contained in CODIS. The FBI limits the information stored in CODIS—"[n]o names or other personal identifiers of the offenders, arrestees, or detainees are stored." Federal Bureau of Investigation, CODIS and NDIS Fact Sheet,[11] *available at* http://www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet (last visited July 8, 2011). Instead, the database contains only the following information: (1) the DNA profile; (2) a number identifying the agency that submitted the DNA profile ("the Agency Identifier"); (3) a "Specimen Identification Number" which the FBI states is "generally a number assigned sequentially at the time of sample collection" and "does **not** correspond to the individual's social security number, criminal history identifier, or correctional facility identifier;" and (4) information identifying the laboratory personnel associated with creating the profile. *Id.* The FBI's restrictions on the type of

---

[11] "NDIS" refers to the "National DNA Index System" which "is considered one part of CODIS." Federal Bureau of Investigation, CODIS and NDIS Fact Sheet, *available at* http://www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet (last visited July 8, 2011).

information stored in CODIS reflect Congress's concern about creating "strict privacy protections." H.R. Rep. No. 106-900(I), at 27. Therefore, a user conducting a search of CODIS can access only a limited amount of information, none of which identifies the person to whom the profile belongs.

The second relevant Government policy pertains to the data used to create the profile. Neither the DNA Act nor the Crime Control Act specifies what portion of the DNA shall be used in creating the profile included in CODIS. *See* 42 U.S.C. § 14135a(c)(2) (defining DNA analysis as "analysis of the deoxyribonucleic acid (DNA) identification information in a bodily sample"); *Weikert*, 504 F.3d at 13 n.10. Nevertheless, in practice, the FBI has developed a consistent policy of analyzing only what is commonly called "junk DNA." CODIS and NDIS Fact Sheet, *available at* http://www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet (last visited July 8, 2011); *accord Weikert*, 504 F.3d at 13 n.10 ("The government has stated repeatedly that it uses only junk DNA in creating individual DNA profiles. . . . For purposes of this appeal, we take the government at its word . . . ."). "Junk DNA" refers to "non-genic stretches of DNA not presently recognized as being responsible for trait coding." *United States v. Kincade*, 379 F.3d 813, 818 (9th Cir. 2004) (en banc) (plurality op.). By using only so-called "junk DNA" to create the profile, the Government ensures that meaningful personal genetic information about the individual is not published in CODIS.

Some explanation of the process by which the profile is created will illuminate this important feature of CODIS. The DNA profiles in CODIS make "use of short tandem

27

repeat technology ("STR")" that are "located at 13 markers (or loci) on DNA present in the specimen." *Kincade*, 379 F.3d at 818. STRs have been described as repeated sequences of the "base pairs" of DNA. Henry T. Greely et al., *Family Ties: The Use of DNA Offender Databases to Catch Offenders' Kin,* 34 J.L. Med. & Ethics 248, 249 (2006). They are found at "thirteen specific regions, or loci, on an individual's DNA." *Boroian v. Mueller*, 616 F.3d 60, 65-66 (1st Cir. 2010). Again, these loci are "non-genic stretches of DNA not presently recognized as being responsible for trait coding." *Kincade*, 379 F.3d at 818.

STRs are useful for identification not because of any genetic information but because they "result[] in different numbers of copies of repeated sequences." Greely, *supra*, at 249. For example, "[o]ne person might have two copies of the first marker that are four and eight repeats long, copies of the second that are eleven and twenty-three copies long, copies of the third that are three and ten copies long, and so on through all thirteen markers." *Id.* at 250. Therefore, it is "[t]he fact that these stretches of DNA have a different number of these repeats [that] makes them useful as 'markers.'" *Id.* These "repeats" "have no function." *Id.* "They do not code for RNA, and they do not seem to be responsible for any difference in the structure or functioning of the people who carry them." *Id.*

The legislative history of the DNA Act confirms that these "genetic markers" were "purposely selected because they are not associated with any known physical or medical characteristics, providing further assurance against the use of convicted offender DNA profiles for purposes other than law enforcement identification." H.R. Rep. No. 106-900(I), at 27.

Effectively, the use of "junk DNA" creates a "DNA fingerprint" that yields precise information about identity but little or no other personal information.[12] As stated in the House Report:

> DNA profiles generated in conformity with the national standards do not reveal information relating to any medical condition or other trait. By design, the effect of the system is to provide a kind of genetic fingerprint, which uniquely identifies an individual, but does not provide a basis for determining or inferring anything else about the person.

*Id.* Due to the nature of DNA and the number of loci used to create the profile, "the chance that two randomly selected individuals will share the same profile [is] infinitesimal—as are the chances that a person randomly selected from the population at large will present the same DNA profile as that drawn from crime-scene evidence." *Kincade*, 379 F.3d at 819 (plurality op.).

---

[12] In practice, "[b]ecause there are observed group variances in the representation of various alleles at the STR loci . . . , DNA profiles derived by STR may yield probabilistic evidence of the contributor's race or sex." *Kincade*, 379 F.3d at 818 (plurality op.). Nevertheless, based on "the substantial number of alleles present at each of the 13 STR loci (between 7 and 20) and wide-spread variances in their representation among human beings," DNA profiles created through STR are "highly individuated." *Id.* at 818–19 (internal citation omitted).

In 2005 and 2006, Congress expanded the categories of individuals subject to DNA collection. In its present form, the DNA Act allows the Attorney General to "collect DNA samples from individuals who are arrested, facing charges, or convicted." 42 U.S.C. § 14135a(a)(1)(A). The latest expansion went into effect with the promulgation of regulations by the Attorney General effective January 9, 2009. *See* 28 C.F.R. § 28.12. In relevant part, the regulations provide that "[a]ny agency of the United States that arrests or detains individuals or supervises individuals facing charges shall collect DNA samples from individuals who are arrested, facing charges, or convicted." *Id.* § 28.12(b). The regulations also recognize the Attorney General's authority to limit the individuals from whom DNA is collected: "Unless otherwise directed by the Attorney General, the collection of DNA samples under this paragraph may be limited to individuals from whom the agency collects fingerprints and may be subject to other limitations or exceptions approved by the Attorney General." *Id.* While the DNA Act *permits* the collection of DNA samples from individuals who are arrested or facing charges, the regulation *mandates* such collection.

The DNA Act and its state-law analogues have been subject to numerous constitutional challenges, generally on the ground that DNA collection and analysis is an unreasonable search in violation of the Fourth Amendment. Every federal circuit court to have considered these statutes as applied to an individual who has been convicted and is either incarcerated or on probation, parole, or supervised release has upheld the constitutionality of the challenged statute.[13] The

---

[13] *See, e.g.*, *United States v. Stewart*, 532 F.3d 32, 36–37 (1st Cir. 2008); *United States v. Kriesel*, 508 F.3d 941, 950 (9th

Ninth Circuit, the only other Court of Appeals to have considered whether the statute is constitutional as applied to arrestees or pretrial detainees, initially upheld the expanded version of the DNA Act. *United States v. Pool*, 621 F.3d 1213, 1219-24 (9th Cir. 2010) (concluding that under the totality of the circumstances test, collection of DNA samples under the DNA Fingerprint Act from a defendant who has been indicted, arrested, and detained for a federal felony but not yet convicted complies with the Fourth Amendment), though it has since withdrawn the panel opinions in anticipation of en banc review.[14]

_____

Cir. 2007); *Weikert*, 504 F.3d at 15; *Banks v. United States*, 490 F.3d 1178, 1193 (10th Cir. 2007); *United States v. Amerson*, 483 F.3d 73, 75 (2d Cir. 2007); *United States v. Hook*, 471 F.3d 766, 773 (7th Cir. 2006); *United States v. Conley*, 453 F.3d 674, 679–81 (6th Cir. 2006); *United States v. Kraklio*, 451 F.3d 922, 924–25 (8th Cir. 2006); *Johnson v. Quander*, 440 F.3d 489, 497 (D.C. Cir. 2006); *Nicholas v. Goord*, 430 F.3d 652, 655 (2d Cir. 2005); *Sczubelek*, 402 F.3d at 177; *Kincade*, 379 F.3d at 839. Recently, in *Boroian*, *supra*, the First Circuit addressed the issue of whether the Government's retention of a former probationer's DNA profile in CODIS implicated the Fourth Amendment. The Court of Appeals held that the "FBI's retention and periodic matching of [the offender's DNA profile] against other profiles in CODIS for the purpose of identification" did not constitute an "intrusion on the offender's legitimate expectation of privacy and thus [did] not constitute a separate Fourth Amendment search." 616 F.3d at 68.

[14] On June 2, 2011, the Ninth Circuit voted to rehear *Pool* en banc. The three-judge opinion may no longer "be cited as

31

## B. Analytical Framework

In analyzing Mitchell's Fourth Amendment challenge to the 2006 DNA Act, the District Court performed a "totality of the circumstances" test, balancing "'on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which [the search] is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at 119 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Mitchell argued before the District Court that the proper approach was the "special needs" exception as set forth in *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). On appeal, Mitchell no longer challenges the District Court's adoption of the totality of the circumstances test, instead arguing that the search is unjustifiable under such an approach. Although the District Court's form of analysis is uncontested, because we exercise plenary review, we determine *de novo* the appropriate analytical framework for assessing Mitchell's challenge.

Prior to Congress's 2005 and 2006 expansions of the DNA Act, every circuit court to have considered the constitutionality of a DNA indexing statute upheld the statute under the Fourth Amendment. Nevertheless, the circuits have divided regarding the correct method of Fourth Amendment analysis. We and the majority of circuits—the First, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, and District of Columbia—have endorsed a totality of the circumstances

binding precedent by or to any court of the Ninth Circuit." *United States v. Pool*, --- F.3d ---, 2011 WL 2151202, at *1 (9th Cir. June 2, 2011).

approach.[15] *See Weikert*, 504 F.3d at 9–11; *Sczubelek*, 402 F.3d at 184; *Jones*, 962 F.2d at 306–08; *Groceman*, 354 F.3d at 413; *Wilson*, 517 F.3d at 427; *Kraklio*, 451 F.3d at 924; *Kriesel*, 508 F.3d at 946; *Padgett v. Donald*, 401 F.3d 1273, 1278 n.4 (11th Cir. 2005); *Johnson v. Quander*, 440 F.3d 489, 494 n.1, 496 (D.C. Cir. 2006). In *Sczubelek*, a case concerning the constitutionality of the DNA Act as applied to individuals on supervised release, we examined both approaches and concluded that the proper mode of analysis was the totality of the circumstances test. 402 F.3d at 184. We rejected the special needs approach on the grounds that "the purpose for the collection of DNA goes well beyond the supervision by the Probation Office of an individual on supervised release." *Id.*; *accord Weikert*, 504 F.3d at 10 (holding that the special needs test is inappropriate as "law enforcement objectives predominate" in the collection of DNA).

*Sczubelek* and the other cases adopting the totality of the circumstances approach rely on *Knights* and on *Samson v. California*, 547 U.S. 843 (2006), which concern, respectively, searches of a probationer and a parolee. The totality of the circumstances approach, however, applies to circumstances beyond the supervised release setting. The Supreme Court

---

[15] Only the Second and Seventh Circuits have consistently held otherwise, employing the special needs exception in every case concerning the constitutionality of a DNA indexing statute. *See Amerson*, 483 F.3d at 78; *Hook*, 471 F.3d at 773; *Green v. Berge*, 354 F.3d 675, 677–78 (7th Cir. 2004). The Tenth Circuit has noted that its "own precedents are divided," but it applied the totality of the circumstances test in its most recent case. *Banks*, 490 F.3d at 1183–84.

has "described 'the balancing of competing interests' as 'the key principle of the Fourth Amendment.'" *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981)) (further citation omitted); *see also Bell v. Wolfish*, 441 U.S. 520, 559–60 (1979) (upholding the constitutionality of strip searches of pretrial detainees under a totality of the circumstances balancing approach). Balancing the totality of the circumstances is the "general Fourth Amendment approach" used to assess the reasonableness of a contested search. *Knights*, 534 U.S. at 118. As such, we follow *Sczubelek* and apply the totality of the circumstances test to the present challenge to the latest iteration of the DNA Act.

### 1. Case Law Analyzing DNA Collection Following Conviction

As a starting point, it is useful to examine how the cases upholding DNA collection following conviction assessed the totality of the circumstances in concluding that such searches were reasonable. These cases analyzed challenges to the DNA Act and its state-law analogues brought by individuals who were incarcerated following convictions ("prisoners") or by individuals on probation, parole, or supervised release (collectively, "probationers").[16]

In our case in this category, *Sczubelek*, we "examine[d] . . . the taking of the [DNA] sample under the . . . *Knights* totality of the circumstances test" and concluded

---

[16] Although the analysis may differ slightly with respect to individuals on parole, probation, or supervised release, for present purposes, these differences are immaterial.

34

that "the taking of a DNA sample from an individual on supervised release is not an unreasonable search." 402 F.3d at 184. In conducting the Fourth Amendment balancing, we considered a number of factors. "First, the intrusion of a blood test is minimal." *Id.* (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 625 (1989)). Second, while acknowledging that the "slight intrusion [of a blood test] into an ordinary citizen's privacy [would be] unconstitutional, individuals on supervised release, like individuals on probation, 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Sczubelek*, 402 F.3d at 184 (quoting *Knights*, 534 U.S. at 119 (internal quotation marks & citations omitted)). Considering Sczubelek's status as an individual who had been convicted of a felony and who was on supervised release, we held that he "ha[d] a reduced right to privacy—and in particular to privacy of identity. . . . Individuals on supervised release cannot reasonably expect to keep information bearing on their physical identity from government records." *Id.* at 184–85. Thus, in assessing "the degree to which [the DNA collection] intrude[d] on [Sczubelek's] privacy," *id.* at 182 (internal quotation marks & citation omitted), we concluded that "for criminal offenders the privacy interests implicated by the collection of DNA are minimal," *id.* at 185.

On the other side of the scale, "the degree to which [DNA collection] is needed for the promotion of legitimate governmental interests," *id.* at 182 (internal quotation marks & citation omitted), "we agree[d] with the government that it has a compelling interest in the collection of identifying information of criminal offenders," *id.* at 185. We reasoned that "[a] DNA database promotes increased accuracy in the investigation and prosecution of criminal cases" and will "aid

35

in solving crimes when they occur in the future," "help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit," and "help to eliminate individuals from suspect lists when crimes occur." *Id.* As such, we concluded that "[t]he interest in accurate criminal investigations and prosecutions is a compelling interest that the DNA Act can reasonably be said to advance." *Id.*

Finally, we considered additional factors that contributed to the reasonableness of the search. Analyzing the prior version of the DNA Act, we held that the Act itself clearly delineates from whom a sample must be taken, leaving no discretion to probation officers. *Id.* at 187. Moreover, we reasoned, the DNA Act specifies permissible uses for the samples and punishes unauthorized disclosure of DNA samples. *Id.* It also provides for expungement of the DNA profile from CODIS upon reversal or dismissal of a conviction. *Id.* Assessing the totality of the circumstances surrounding the collection and analysis of DNA samples from probationers, we concluded:

> In view of the importance of the public interests in the collection of DNA samples from criminal offenders for entry into a national DNA database and the degree to which the DNA Act serves to meet those interests, balanced against the minimal intrusion occasioned by giving a blood sample and the reduced privacy expectations of individuals on supervised release, we conclude that the collection of DNA samples from individuals on supervised release, pursuant to the DNA Act, is not an

unreasonable search in violation of the Fourth Amendment.

*Id.*

Our sister circuits have engaged in a very similar analysis, relying in general on the same considerations that informed our decision in *Sczubelek*. The other circuits have identified some factors that we did not explicitly consider, such as the government's compelling interest in "contribut[ing] to the solution of past crimes." *Kriesel*, 508 F.3d at 949. Ultimately, those courts likewise concluded that the collection of DNA samples from prisoners or probationers is a reasonable search consistent with the Fourth Amendment.

## 2. Totality of the Circumstances Analysis

The 2006 revision to the DNA Act expanded its scope to encompass both arrestees and pretrial detainees. Violence Against Women & Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1004, 119 Stat. 2960, 3085 (codified as amended at 42 U.S.C. § 14135a(a)(1)(A)). Mitchell was placed in pretrial detention following his arrest and was detained at the time that the Government sought to collect a sample of his DNA pursuant to the DNA Act and its implementing regulation. Thus the challenge currently before us implicates the collection of DNA from an individual who is both an arrestee and a pretrial detainee.

As a threshold matter, we must tackle the question of whether Mitchell's attack on 42 U.S.C. § 14135a is in the form of an as-applied or a facial challenge. Following oral argument, this Court requested additional briefing to clarify

this issue, which ultimately affects the burden on Mitchell. A party asserting a facial challenge "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is, Mitchell would have to show that the "[statute] is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008) (citing *Salerno*, 481 U.S. at 745). This is the "most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745. On the other hand, "[a]n as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010).

If the additional briefing makes one thing clear, it is that the parties dispute whether Mitchell's challenge was facial or as-applied.[17] In addition, the District Court did not

---

[17] At oral argument, in response to a question regarding whether Mitchell raised an as-applied or a facial challenge, the FPD responded that Mitchell advanced a facial attack on the statute. Notwithstanding the FPD's statement during oral argument, in the additional briefing submitted to the Court, the FPD maintained that Mitchell's challenge to the statute is, and had always been, as-applied. The FPD contended that Mitchell's legal arguments focused on the particular circumstances of his situation, thus narrowing the nature of his challenge to the statute. The FPD also argued that the Government's position on appeal revealed that the Government believed that Mitchell had advanced an as-

specify what type of challenge it was considering, and the original briefs filed with this court are similarly ambiguous. Given that there is no consensus among the parties about the type of legal challenge being asserted, we will address both. In doing so, we adopt an approach similar to the one we took recently in *Marcavage*, 609 F.3d at 273, where after finding that there was some ambiguity about whether the defendant advanced an as-applied or a facial challenge, we addressed both. While we note that facial challenges are disfavored, *Washington State Grange*, 552 U.S. at 450, the circumstances in this situation weigh in favor of addressing both challenges.

We will begin with Mitchell's as-applied challenge. *See Connection Distributing Co. v. Holder*, 557 F.3d 321, 327-28 (6th Cir. 2009) (explaining that "[t]he 'usual judicial practice' is to address an as-applied challenge before a facial challenge") (citing *Bd. of Trs. of the State Univ. of N.Y. v. Fox,* 492 U.S. 469, 484-85 (1989)). In order to mount a successful as-applied challenge, Mitchell must show that "under [these] particular circumstances [he was] deprived . . . of a constitutional right." *Marcavage*, 609 F.3d at 273.

---

applied challenge. Mitchell's appointed counsel, Knorr, joined the FPD's submission.

Not surprisingly, the Government's position was that Mitchell's challenge to the statute is, and always has been, a facial challenge. The Government submitted that Mitchell presented a facial challenge in the District Court, which the court treated as such, and that, on appeal, the Government framed the issues as relating to the facial constitutionality of the statue.

## a. Expectation of Privacy

When we analyze the reasonableness of a search by examining the totality of the circumstances, we begin "'by assessing . . . the degree to which [the search] intrudes upon an individual's privacy.'" *Knights*, 534 U.S. at 118–19 (quoting *Houghton*, 526 U.S. at 300).

The collection of DNA under § 14135a entails two separate "searches." The first is the physical collection of the DNA sample. Neither party disputes that the *collection* of a DNA sample constitutes an invasion of privacy that is subject to the strictures of the Fourth Amendment, and we have so held. *See Sczubelek*, 402 F.3d at 182 (concluding that giving a required blood sample for DNA analysis is a search); *Skinner*, 489 U.S. at 616 (holding that "[w]e have long recognized that a compelled intrusion into the body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search. . . . This physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." (internal quotation marks, citations, & some alterations omitted)).

Mitchell contends that the act of collecting a DNA sample "constitute[s] [a] significant invasion[] of an individual's bodily integrity and privacy." (Mitchell Br. 41.) This argument, however, is foreclosed by binding precedent. The Supreme Court has repeatedly held that the "intrusion occasioned by a blood test is not significant, since such 'tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most

people the procedure involves virtually no risk, trauma, or pain.'" *Skinner*, 489 U.S. at 625 (quoting *Schmerber v. California*, 384 U.S. 757, 771 (1966)); *accord Sczubelek*, 402 F.3d at 184 ("[T]he intrusion of a blood test is minimal."). Moreover, "*Schmerber* recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." *Winston v. Lee*, 470 U.S. 753, 762 (1985). Thus, Mitchell's characterization to the contrary must fail.

Furthermore, the test sanctioned in *Schmerber* was venipuncture, in which blood was drawn from the arm. 384 U.S. at 759-60. "[C]urrently the FBI provides kits that allow a blood sample to be collected by means of a finger prick," a far less invasive procedure. DNA-Sample Collection & Biological Evidence Preservation in the Federal Jurisdiction ("DNA-Sample Collection"), 73 Fed. Reg. 74932, 74935 (Dec. 10, 2008). DNA samples may also be collected by swabbing the inside of the mouth (a "buccal swab"). *Id.* This method is likewise less invasive than venipuncture. *Nicholas v. Goord*, 430 F.3d 652, 656 n.5 (2d Cir. 2005) (finding that cheek swabs, although constituting a search, are less invasive than blood draws); *cf. Skinner*, 489 U.S. at 625 (noting that breath tests are less intrusive than blood tests as they "do not require piercing the skin and may be conducted safely outside a hospital environment").

In light of this precedent, the act of collecting a DNA sample is "neither a significant nor an unusual intrusion." *Weikert*, 504 F.3d at 12. Therefore, in balancing the interests required in our Fourth Amendment analysis, the intrusion occasioned by the act of collecting the DNA sample is minimal and does not weigh significantly in Mitchell's favor.

41

The second "search" at issue is, of course, the processing of the DNA sample and creation of the DNA profile for CODIS. This search also has the potential to infringe upon privacy interests. *See Sczubelek*, 402 F.3d at 182; *Amerson*, 483 F.3d at 85. Mitchell argues that this intrusion is significant and unreasonable given that "the scope of information that can be obtained from a DNA sample is extraordinarily broad." (Mitchell Br. 34.) Furthermore, Mitchell speculates that the Government might disregard its policy of using only "junk DNA" and surmises that, with technological advances, "junk DNA" could reveal far more extensive information than it presently discloses. These concerns weighed heavily in the District Court's analysis and caused the District Court to conclude that DNA is "an information science," "not an identification science." *Mitchell*, 681 F. Supp. 2d at 609.

We are "mindful of the vast amount of sensitive information that can be mined from a person's DNA and the very strong privacy interests that all individuals have in this information." *Amerson*, 483 F.3d at 85. Nevertheless, every one of our sister circuits to have considered the concerns raised by Mitchell has rejected them given their speculative nature and the safeguards attendant to DNA collection and analysis. *See, e.g.*, *Boroian*, 616 F.3d at 66-69; *Kriesel*, 508 F.3d at 948 & n.10. As the First Circuit held, the "DNA Act offers a substantial deterrent to such hypothetical abuse by imposing a criminal penalty for misuse of DNA samples. . . . [O]n the record before us, the possibility that junk DNA may not be junk DNA some day also does not significantly augment [the defendant's] privacy interest in the present case." *Weikert*, 504 F.3d at 13. Mitchell's concerns are not

42

reflected in the record before us.  The mere possibility of such misuse "can be accorded only limited weight in a balancing analysis that focuses on present circumstances."  *Weikert*, 504 F.3d at 13; *accord Banks*, 490 F.3d at 1191.

Mitchell also highlights the potential misuse of the information contained in the DNA profile.  While Mitchell has not provided any evidence of misuse of a DNA sample or profile, we are also reassured by the numerous protections in place guarding against that possibility.  As we explained earlier, the Act criminalizes the misuse of both the sample and the analysis generated from the sample.  42 U.S.C. § 14135e(c).  These criminal penalties offer a "substantial deterrent to such hypothetical abuse" of the kind advanced by Mitchell.  *Weikert*, 504 F.3d at 13.  Additional protections exist.  The Act provides that failure to comply with "the quality control and privacy requirements" can result in cancellation of access to CODIS.  42 U.S.C. § 14132(c).  Access to the "computer terminals/servers containing the CODIS software," which are "located in physically secure space at a criminal justice agency," is restricted to "those individuals authorized to use CODIS and approved by the FBI."  CODIS and NDIS Fact Sheet, *available at* http://www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet (last visited July 8, 2011).

Moreover, the DNA profile may only be used for four limited purposes.  42 § 14132(b)(3).[18]  Use of the profile for

---

[18] The parameters of the statute are, of course, essential in limiting the Government's ability to use the information it collects.  Though we need not decide the point today, any attempt by the Government to go beyond these enumerated

43

any other reason would violate the statute and be subject to the aforementioned criminal penalties. Congress's limited purpose in enacting § 14135a is evident in the history of the Act. *See, e.g.*, DNA-Sample Collection, 73 Fed. Reg. at 74933 ("These DNA profiles, which embody information concerning 13 'core loci,' amount to 'genetic fingerprints' that can be used to identify an individual uniquely, but do not disclose an individual's traits, disorders, or dispositions."). These limits on the lawful use of the DNA profile are further insured by the method for creating a CODIS profile; that is, the policy of using only "junk DNA" in creating the DNA profile, which does not contain any individual genetic information. The Government further protects the identity of the sample donor by ensuring that no other potentially identifying information is contained in the CODIS database.

The second scenario—in which scientific advances make it possible to extract more information from "junk DNA"—is "not unforeseeable." *Weikert*, 504 F.3d at 13. Nevertheless, our sister circuits have declined to factor this future risk into their assessment of the constitutionality of the DNA collection program as it exists at present. *See Amerson*, 483 F.3d at 85 n.13 ("Should the uses to which 'junk DNA' can be put be shown in the future to be significantly greater than the record before us today suggests, a reconsideration of the reasonableness balance struck would be necessary."); *Kriesel*, 508 F.3d at 948 n.10; *Weikert*, 504 F.3d at 13. The First Circuit recently rejected this same argument:

---

purposes would seem likely to first require congressional action.

44

> "[S]cientific advances might make it possible to deduce information beyond identity from the junk DNA" that forms the thirteen-loci profiles stored in CODIS. Future government uses of the DNA profiles in CODIS could potentially reveal more intimate or private information about the profile's owner and depart from the uses for which the profiles were originally lawfully created and retained. In this case, however, these are merely hypothetical possibilities. . . . As in *Weikert*, "the possibility that junk DNA may not be junk DNA some day . . . does not significantly augment [Boroian's] privacy interest in the present case."

*Boroian*, 616 F.3d at 69 (internal citations omitted).

We agree with this analysis. While we acknowledge the seriousness of Mitchell's concerns about the possible misuse and future use of DNA samples, we conclude that these hypothetical possibilities are unsupported by the record before us and thus do not have any substantial weight in our totality of the circumstances analysis. Should technological advancements change the value of "junk DNA," reconsideration of our Fourth Amendment analysis may be appropriate. *Cf. City of Ontario v. Quon*, 130 S. Ct. 2619, 2629 (2010) ("The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear."). At this juncture, however, we consider the amount and type of personal information to be contained in the DNA profile to be nominal. *See Kincade*, 379 F.3d at 838 ("As currently structured and implemented . . . the DNA Act's compulsory

profiling of qualified federal offenders can only be described as minimally invasive-both in terms of the bodily intrusion it occasions, and the information it lawfully produces.").

Next, contending that a DNA profile is used for far more than identity, Mitchell attempts to distinguish a DNA profile from conventional fingerprints.[19] The District Court

---

[19] One way in which Mitchell attempts to distinguish DNA from fingerprints is to argue that "[u]nlike fingerprints, DNA can be used to investigate biological relationships between individuals." (Mitchell Br. 35) There are two potential uses of the database that implicate biological relationships. The first, is an "ordinary search[] seeking exact matches" that incidentally leads to a *partial match*, which may or may not belong to the relative of the person whose profile was run against the database. DNA-Sample Collection, 73 Fed. Reg. at 74938. The second is a "familial search" which typically refers to a *purposeful* search of the DNA database "not for the person who left the crime-scene sample, but rather for a relative of that individual." Erin Murphy, *Relative Doubt: Familial Searches of DNA Databases*, 109 Mich. L. Rev. 291, 297, 300 (2010).

The possibility of an unintentional or intentional CODIS "hit" for Mitchell's biological relatives does not change our analysis. To begin with, Mitchell has not shown that he has standing to assert the Fourth Amendment rights of his relatives. *See Rakas v. Illinois*, 439 U.S. 128, 138–40 (1978). Even if he did, the record does not contain any evidence of a possible search or investigation of Mitchell's relatives, and the claim is entirely speculative. *See Boroian*, 616 F.3d at 70 ("The record contains no other information

46

agreed, holding that "to compare the fingerprinting process and the resulting identification information obtained therefrom with DNA profiling is pure folly." *Mitchell*, 681 F. Supp. 2d at 608. Yet many of our sister circuits have expressly adopted just this analogy:

> To be sure, genetic fingerprints differ somewhat from their metacarpal brethren, and future technological advances in DNA testing (coupled with possible expansions of the DNA Act's scope) may empower the government to conduct wide-ranging "DNA dragnets" that raise justifiable citations to George Orwell. Today, however, . . . CODIS operates much like an old-fashioned fingerprint database (albeit more efficiently).

shedding light on how frequently partial matches occur in the national database, exactly what they reveal, or what kind of follow-up investigation is done when a partial match arises. . . . [Therefore] . . . that claim is similarly speculative."). In this respect, we also find it significant that CODIS is not designed for intentional familial searches and experts agree that searches of that type would not produce any useful information. DNA-Sample Collection, 73 Fed. Reg. at 74938 ("The current design of the DNA identification system does not encompass searches of this type against the national DNA index."); *see also* Murphy, *supra* at 300 ("[M]ost experts acknowledge that the current iteration of the CODIS software does a poor job of identifying true leads in familial searches.").

*Johnson*, 440 F.3d at 499 (internal citations omitted); *Boroian*, 616 F.3d at 65 ("Under the DNA Act, DNA profiles currently function as identification records not unlike fingerprints, photographs, or social security numbers."); *accord Banks*, 490 F.3d at 1192 ("These restrictions allow the Government to use an offender's DNA profile in substantially the same way that the Government uses fingerprint and photographic evidence . . . . Only here, DNA provides a more advanced and accurate means . . . ."); *Rise v. Oregon*, 59 F.3d 1556, 1559 (9th Cir. 1995) ("The information derived from the blood sample is substantially the same as that derived from fingerprinting—an identifying marker unique to the individual from whom the information is derived."), *overruled on other grounds, City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001); *Jones*, 962 F.2d at 307 ("The governmental justification for this form of identification . . . relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.").

Like fingerprints, "at least in the current state of scientific knowledge, the DNA profile derived from the [individual's] blood sample establishes only a record of the [individual's] identity." *Amerson*, 483 F.3d at 85; *accord Kriesel*, 508 F.3d at 947. Given the protections built into the DNA Act, the Government's stated practice of only analyzing "junk DNA," and the current limits of technology, the information stored in CODIS serves only an identification purpose. Moreover, the regulations of the 2006 amendment to the DNA Act confirms the intention to use DNA profiles as "sanitized 'genetic fingerprints' that can be used to identify

48

an individual uniquely, but do not disclose an individual's traits, disorders, or dispositions." DNA-Sample Collection, 73 Fed. Reg. at 74937. Given the record in front of us today, we conclude that a DNA profile is used solely as an accurate, unique, identifying marker—in other words, as fingerprints for the twenty-first century.

Considering a DNA profile as a tool for establishing identity, the issue becomes the degree to which an individual has an expectation of privacy in his or her own identity. In *Sczubelek*, we considered this issue with respect to individuals on supervised release and noted that they "'do not enjoy the absolute liberty to which every citizen is entitled.'" 402 F.3d at 184 (quoting *Knights*, 534 U.S. at 119). In light of this restricted liberty right, we held that "Sczubelek, as an individual on supervised release, has a reduced right to privacy—and in particular to privacy of identity." *Id.* Our analysis relied heavily on Sczubelek's status as a convicted felon on supervised release; as such, it cannot be adopted wholesale in the present case, as Mitchell correctly argues. Instead, the critical question is whether arrestees and pretrial detainees who have not been convicted of felonies have a diminished privacy interest in their identity.

A useful analogue is case law assessing the validity of fingerprinting arrestees and pretrial detainees as part of a routine booking process.[20] In an early case, the Second

---

[20] Many cases simply assume the propriety of such booking procedures with little analysis. *See, e.g.*, *Napolitano v. United States*, 340 F.2d 313, 314 (1st Cir. 1965) ("Taking of fingerprints [before releasing an arrestee on bail] is universally standard procedure, and no violation of

49

Circuit held that fingerprinting is a "means for the identification of prisoners so that they may be apprehended in the event of escape, so that second offenders may be detected for purposes of proper sentence where conviction is had, and so that the government may be able to ascertain . . . whether the defendant has been previously convicted." *United States v. Kelly*, 55 F.2d 67, 68 (2d Cir. 1932). Acknowledging that "[a]ny restraint of the person may be burdensome," the court held that "[t]he slight interference with the person involved in finger printing seems to us one which must be borne in the common interest." *Id.* The court emphasized that fingerprinting arrestees is for the purpose of *identification*:

> Finger printing seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws. It is known to be a very certain means devised by modern science to reach the desired end, and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification.

constitutional rights."); *Smith v. United States*, 324 F.2d 879, 882 (D.C. Cir. 1963) ("[I]t is elementary that a person in lawful custody may be required to submit to photographing and fingerprinting as part of routine identification processes."); *United States v. Iacullo*, 226 F.2d 788, 792–93 (7th Cir. 1955).

*Id.*; *accord United States v. Krapf*, 285 F.2d 647, 650–51 (3d Cir. 1961) ("[Fingerprinting] is a means of identification which is useful in many circumstances some of which relate to the enforcement of our laws."). The court upheld the booking procedure based on "the general right of the authorities charged with the enforcement of the criminal law to employ finger printing as an appropriate means to identify criminals and detect crime."[21] *Kelly*, 55 F.2d at 70.

Suspicionless fingerprinting of all citizens would violate the Fourth Amendment. *See Hayes v. Florida*, 470 U.S. 811, 813–18 (1985); *Davis v. Mississippi*, 394 U.S. 721, 727 (1969). Nevertheless, it is "elementary" that blanket fingerprinting of individuals who have been lawfully arrested or charged with a crime does not run afoul of the Fourth Amendment. *Smith*, 324 F.2d at 882. The universal approbation of fingerprinting as a method of identifying arrestees despite the invasion of privacy "is not surprising

---

[21] Similar to the maintenance of DNA profiles in CODIS, fingerprints are stored in a database. When fingerprints are taken from an arrestee, they are run against a database to search for matches to other unsolved crimes. This, indeed, is part of the purpose of fingerprinting an arrestee. *See Kelly*, 55 F.2d at 68 (noting that fingerprints allow for the detection of "second offenders"). Accessing such fingerprint or DNA databases does not independently implicate the Fourth Amendment. *Johnson*, 440 F.3d at 499 ("We note that the consequences of the contrary conclusion would be staggering: Police departments across the country could face an intolerable burden if every 'search' of an ordinary fingerprint database were subject to Fourth Amendment challenges. The same applies to DNA fingerprints.").

when we consider that probable cause had already supplied the basis for bringing the person within the criminal justice system. With the person's loss of liberty upon arrest comes the loss of at least some, if not all, rights to personal privacy otherwise protected by the Fourth Amendment." *Jones*, 962 F.2d at 306; *see also Kincade*, 379 F.3d at 864 (Reinhardt, J., dissenting) ("Arrestees' privacy interests . . . appear to be significantly reduced."). This analysis rests on two foundational principles—the presence of probable cause to arrest and the use of fingerprints as a method of identification:

> [W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes.

*Jones*, 962 F.2d at 306. Moreover, we permit such fingerprinting "whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification." *Id.*; *accord Rise*, 59 F.3d at 1559–60.

This logic extends to the collection and analysis of DNA samples from arrestees and pretrial detainees. *See Anderson v. Virginia*, 650 S.E.2d 702, 705 (Va. 2007) ("A DNA sample of the accused taken upon arrest, while more revealing, is no different in character than acquiring fingerprints upon arrest."). DNA collection occurs only after

52

it has been determined that there is probable cause to believe that the arrestee committed a crime. In light of this probable cause finding, arrestees possess a diminished expectation of privacy in their own identity, which has traditionally justified taking their fingerprints and photographs.[22] Likewise, because DNA profiles developed pursuant to the DNA Act function as "genetic fingerprints" used only for identification purposes, arrestees and pretrial detainees have reduced privacy interests in the information derived from a DNA sample.

Mitchell raises an additional concern with the DNA Act and its implementing regulations: the potential indefinite retention of the sample itself. Nothing in the statute instructs the Government what to do with the DNA sample when an individual is no longer under correctional supervision. However, federal law does mandate the expungement of the DNA profile when the FBI receives a certified copy of a court order showing that a conviction is overturned or when, if the sample is taken following an arrest, no charge is filed, the charge is dismissed, or results in an acquittal. 42 U.S.C. § 14132(d)(1)(A). Ultimately, to the extent that Mitchell submits that the potential future indefinite retention of his sample implicates privacy concerns, that issue is not before us

---

[22] In this case, we need not reach the question of whether any additional probable cause requirement other than the requirements inherent in the statute—that an individual is arrested—is necessary. We note, however, that Mitchell was indicted before his arrest, so that the finding of probable cause in this case was made by a grand jury and was not left to the discretion of a policy officer alone.

now. Mitchell remains arrested, indicted, and detained. His DNA sample has not yet been collected and he therefore has not sought expungement. Therefore, he is not in a position to challenge the retention of his sample. *Cf. Weikert,* 504 F.3d at 3 ("Because the appellant is currently on supervised release and will remain so . . .we do not resolve the question of whether it is also constitutional to retain the DNA profile in [CODIS].") We leave for another day the question of whether an individual may challenge the Government's retention of his DNA sample or profile.

In light of the restrictions built into the DNA profiling process, Mitchell's arguments that it constitutes a significant invasion of privacy are unavailing. Relying on the District Court's opinion, Mitchell argues that collection of DNA from arrestees and pretrial detainees cannot be justified on the basis of probable cause as they have not yet been convicted of any offense and thus have the benefit of the presumption of innocence. *See Mitchell*, 681 F. Supp. 2d at 607. The District Court properly declined "to elevate a finding of probable cause to the level of a proper determination of guilt beyond a reasonable doubt." *Id.* at 606. Nonetheless, it acknowledged that an arrestee or pretrial detainee, who is brought into the criminal justice system on the basis of probable cause, "has a diminished expectation of privacy in his identity." *Id.* at 608. The District Court nevertheless concluded that the presumption of innocence outweighed this diminished expectation of privacy because of the "complex, comprehensive, inherently private information contained in a DNA sample." *Id.* As we discussed above, however, this conclusion is based on a flawed premise—that because "DNA *samples* may reveal private information regarding familial lineage and predisposition to over four thousand types of

54

genetic conditions and diseases [as well as] genetic markers for traits," the DNA *profiles* entered into CODIS also contain this information. *Id.* (emphasis added). DNA profiles, as opposed to DNA samples, reveal only identity, in which arrestees have a diminished expectation of privacy.[23]

In sum, at present DNA profiling is simply a more precise method of ascertaining identity and is thus akin to fingerprinting, which has long been accepted as part of routine booking procedures. The traditional fingerprinting cases emphasize that arrestees and pretrial detainees have a diminished expectation of privacy in their identity. None of

---

[23] Both Mitchell and the District Court rely heavily on *Friedman v. Boucher*, 580 F.3d 847, 857 (9th Cir. 2009), in which the Ninth Circuit held that DNA collection from pretrial detainees was unconstitutional because it was not related to prison security. The court reasoned that while penal facilities may conduct administrative searches, "[n]either the Supreme Court nor our court has permitted general suspicionless, warrantless searches of pre-trial detainees for grounds other than institutional security or other legitimate penological interests." *Id.* This reasoning does not undermine the line of case law holding that booking procedures that confirm an individual's identity are both reasonable and necessary to further legitimate law enforcement objectives. The Ninth Circuit itself has noted that "everyday 'booking' procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether investigation of the crime involves fingerprint evidence." *Rise*, 59 F.3d at 1560. As *Friedman* did not consider the identification purpose of DNA samples, we are not inclined to follow it.

Mitchell's arguments compels us to conclude that the same diminished expectation of privacy should not apply to DNA profiling.

### b. Government Interests

The second step in the totality of the circumstances analysis is to assess "the degree to which [the search] is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 119 (internal quotation marks & citation omitted). The Government's interests in this case are not as great as those identified in *Sczubelek*, as the interests in supervising convicted individuals on release and deterring recidivism do not apply to arrestees or pretrial detainees. 402 F.3d at 186. Nevertheless, the other key interest recognized in *Sczubelek*—collecting identifying information to aid law enforcement—applies with equal force to arrestees and pretrial detainees. *Id.* at 185 ("The interest in accurate criminal investigations and prosecutions is a compelling interest that the DNA Act can reasonably be said to advance.").

Mitchell acknowledges that DNA profiling serves important law enforcement interests, but he argues that these interests can be equally well served by collecting DNA samples post-conviction. It is true, as Mitchell asserts, that the information contained in a DNA sample does not change over time and cannot be concealed; thus, there is no need for the Government to act quickly to prevent the destruction of evidence. Nevertheless, the Government argues that there are other legitimate interests that weigh in favor of pretrial DNA collection. We agree.

Most compelling is the Government's strong interest in identifying arrestees. "[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest." *Jones*, 962 F.2d at 306. Given "the potentially greater precision of DNA sampling and matching methods," DNA profiling serves this interest better than fingerprinting. *Sczubelek*, 402 F.3d at 186 (quoting *Jones*, 962 F.2d at 307); *accord Banks*, 490 F.3d at 1190 ("While fingerprint evidence might often be sufficient, we have always recognized the Government's compelling need to accurately identify offenders."). Moreover, DNA may permit identification in cases without fingerprint or eyewitness evidence. As we explained in *Sczubelek*:

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime

> within samples of blood, skin, semen or hair
> follicles.

402 F.3d at 185 (internal quotation marks & citation omitted); *accord Banks*, 490 F.3d at 1190. Thus, DNA collection furthers the Government's interest in accurately identifying arrestees and pretrial detainees, an interest that would be lost if the Government waited until conviction to take a DNA sample.[24]

The Government's ability to accurately identify a person through their DNA profile cannot be entirely substituted by other means of identification, such as fingerprints or photographs. DNA analysis enables the Government to identify a person who has changed their appearance, either permanently or temporarily. *Weikert*, 504 F.3d at 14 ("Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime.") (citing *Amerson*, 483 F.3d at 87); *accord Sczubelek*, 402 F.3d at 185. Similarly, an arrestee who has altered his or her fingerprints in order to avoid detection could also be identified with certainty through their DNA. Therefore, the

---

[24] The federal government is not alone in concluding that the interests served by pretrial DNA collection and testing would not be adequately served by post-conviction collection. As of August 10, 2010, twenty-four states have enacted statutes permitting the collection of a DNA sample from some or all arrestees. State Laws for Arrestee DNA Databases, DNAResource.com (Aug. 10, 2010), http://www.dnaresource.com/ documents/ArresteeDNALaws-2010.pdf.

use of CODIS in the law enforcement process assures greater precision in the identification of arrestees.

Moreover, there are two components to a person's identity: "who that person is (the person's name, date of birth, etc.) and what that person has done (whether the individual has a criminal record, whether he is the same person who committed an as-yet unsolved crime across town, etc.)." *Haskell v. Brown*, 677 F. Supp. 2d 1187, 1199 (N.D. Cal. 2009). The second component—what a person has done—has important pretrial ramifications. Running an arrestee's DNA profile through CODIS could reveal matches to crime-scene DNA samples from unsolved cases. Whether an arrestee is possibly implicated in other crimes is critical to the determination of whether or not to order detention pending trial. *See* 18 U.S.C. § 3142(g)(3)(A) (stating that factors to be considered in the bail determination include a person's "past conduct" and "criminal history").

To the extent that DNA profiling assists the Government in accurate criminal investigations and prosecutions (both of which are dependent on accurately identifying the suspect), it is in the Government's interest to have this information as soon as possible. Collecting DNA samples from arrestees can speed both the investigation of the crime of arrest and the solution of any past crime for which there is a match in CODIS. Moreover, "use of CODIS promptly clears thousands of potential suspects—thereby preventing them from ever being put in that position, and advancing the overwhelming public interest in prosecuting

crimes *accurately*."[25]    *Kincade*, 379 F.3d at 839 n.38 (plurality op.) (internal quotation marks & citation omitted). The assistance provided by CODIS is not hypothetical: as of May 2011, CODIS "ha[d] produced over 144,400 hits assisting in more than 138,100 investigations." FBI, CODIS-NDIS Statistics, *available at* http://www.fbi.gov/about-us/lab/codis/ndis-statistics (last visited July 8, 2011). While

---

[25] The Government also argues that the collection of DNA samples from arrestees helps to detect and deter any violations of pretrial release. Any such interest is outweighed by the presumption of innocence, relied on so heavily by Mitchell. "The government's interest in preventing crime by arrestees is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987). Nevertheless, any assumption that an arrestee is "more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence. . . . Defendant is, after all, constitutionally presumed to be innocent pending trial . . . ." *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006). That presumption instructs that the fact "[t]hat an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody. Defendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt." *Id.* Thus, in comparison to the probationer cases, the interests in supervision and prevention of recidivism are much diminished, if not absent, in the context of arrestees and pretrial detainees.

Mitchell draws our attention to a backlog in the analysis of DNA samples, the evidence he cites in support does not point to any backlog in the federal system.

Finally, we note that the other factors we identified in *Sczubelek* as weighing in favor of the reasonableness of the search apply with equal force in the present case. While the DNA Act permits the Attorney General to collect DNA samples from arrestees and pretrial detainees, 42 U.S.C. § 14135a(a)(1)(A), the implementing regulation mandates such collection, 28 C.F.R. § 28.12. Thus, once the Attorney General has determined that DNA must be collected, there is no room for law enforcement officials to exercise (or abuse) discretion by deciding whether or not to collect a DNA sample. Moreover, as we discussed more thoroughly above, the statutory structure contains safeguards to prevent the improper use of DNA profiles and to ensure the removal of DNA records from CODIS following a dismissal or an acquittal.

We therefore hold that 42 U.S.C. § 14315a is constitutional as applied to Mitchell. For that reason, we also find that Mitchell's facial challenge to the statute fails. Because the statute is constitutional as applied to Mitchell, he has not shown that "there is no set of circumstances" under which the statute may be applied constitutionally.[26] In sum,

---

[26] There is a potential cause for concern with regard to the scope and breadth of 42 U.S.C. § 14315a. As it is written, the statute applies, for example, to individuals arrested for federal misdemeanors. However, Mitchell cannot raise a successful facial challenge to 42 U.S.C. § 14315a merely by arguing that it is overbroad. *See United States v. Barton*, 633 F.3d 168,

61

under the totality of the circumstances, given arrestees' and pretrial detainees' diminished expectations of privacy in their identities and the Government's legitimate interests in the collection of DNA from these individuals, we conclude that such collection is reasonable and does not violate the Fourth Amendment. Accordingly, the District Court incorrectly prohibited the Government from collecting a sample of Mitchell's DNA pursuant to 42 U.S.C. § 14315a and 28 C.F.R. § 28.12.

## V.

For the foregoing reasons, we will reverse the District Court's grant of Mitchell's motion in opposition to pretrial DNA collection and the District Court's denial of the Government's motion for reconsideration. We will remand for further proceedings consistent with this opinion.

---

172 n.3 (3d Cir. 2011). Outside of the First Amendment, potential overbreadth does not provide a means for striking down a statute. *See Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1253 n.13 (3d Cir. 1996); *see also Salerno*, 481 U.S. at 745 ("The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.") (citing *Schall v. Martin,* 467 U.S. 253, 269 n.18 (1984)). In Mitchell's case, any concerns about the scope of the statute dissipate in light of the fact that he was arrested and indicted for a serious drug offense.

RENDELL, *Circuit Judge*, with whom Circuit Judges McKEE, *Chief Judge*, BARRY, GREENAWAY, JR., and VANASKIE join, and AMBRO joins as to Part II only, dissenting.

I respectfully dissent because I find both of the majority's conclusions here – that we have jurisdiction over this appeal and that the Government's program of collecting, analyzing, and maintaining the DNA of arrestees and pretrial detainees comports with the Fourth Amendment – to be seriously flawed. As to jurisdiction, the pretrial order from which the Government appeals falls squarely outside the narrow class of orders that warrant interlocutory appeal by the Government in criminal cases. The Government's statutory interest in collecting and analyzing Mitchell's DNA implicated by the order is neither "important" in the jurisprudential sense required to justify such appeals, nor completely separate from the merits of Mitchell's case.

With respect to the Fourth Amendment question, the majority gives short shrift to an arrestee's and pretrial detainee's expectation of privacy in his DNA, reducing it to an interest in identity only, and overstates the significance of the Government's interest in collecting evidence to solve crimes. It reasons that limitations on the *use* of an arrestee's most personal information immunizes the Government from the Fourth Amendment's warrant requirement. But this ignores the fact that the searches and seizure of one's DNA permitted by 42 U.S.C. § 14135(a)(1)(A) implicate privacy interests far more expansive than mere identity. In the face of such heightened privacy interests, statutory restrictions on the use of the DNA collected from suspects who have not been convicted of a crime, though not wholly irrelevant, are not

1

panaceas. They cannot offset the severe invasion of privacy that takes place when an arrestee's DNA is seized and searched. And the intent of the Government in using arrestees' DNA to solve other crimes, while it may be salutary and helpful in that regard, is not compelling. When the privacy and Government interests are weighted appropriately, one can only conclude that the Government's program of warrantless, suspicionless DNA collection from arrestees and pretrial detainees is fundamentally incompatible with the Fourth Amendment. Therefore, I respectfully dissent.

## I.

### A.

Our ability to review interlocutory appeals by the Government in criminal cases is extraordinarily restricted. The traditional limit on interlocutory appeals – the final-judgment rule – is "'at its strongest in the field of criminal law,'" where the accused (and society as a whole) have a strong interest in resolving criminal charges quickly. *Flanagan v. United States*, 465 U.S. 259, 264 (1984) (quoting *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982)). Although the collateral-order doctrine provides an exception to the final-judgment rule that may be applied in criminal cases, *Carroll v. United States*, 354 U.S. 394, 403 (1957), the Supreme Court requires that we "interpret[] the requirements of the collateral-order exception to the final judgment rule with the utmost strictness in criminal cases," *Flanagan*, 465 U.S. at 265-66. Heeding the Supreme Court's

mandate, the Courts of Appeals have only sparingly exercised jurisdiction over prejudgment appeals in criminal cases.[1]

Our jurisdiction is further limited in this case because the Government, not the defendant, seeks review of the District Court's order. As the majority itself recognizes, many criminal cases holding that interlocutory review is warranted implicate the rights of the *defendant*. Maj. Op. 15. The exceptional instances where courts have exercised collateral-order jurisdiction over *Government* appeals in criminal cases involved substantial interests that would be lost without interlocutory review. For instance, in *United States v. Whittaker*, 268 F.3d 185, 192 (3d Cir. 2001), we exercised interlocutory jurisdiction over a district-court order that leveled a wholesale challenge at the Government's right to be represented by the United States Attorney in the district of the prosecution. In a similar case, *United States v. Bolden*, 353 F.3d 870, 875-76 (10th Cir. 2003), the Tenth Circuit Court of Appeals explained that an order disqualifying the United States Attorney's office "raises important separation

---

[1]Although the majority relies heavily on cases involving *post-judgment* appeals, such as *United States v. Peterson*, 394 F.3d 98 (2d Cir. 2005), these cases are inapposite, as they present no risk that the Government's appeal will disrupt district court proceedings. *Cf. United States v. Moussaoui*, 483 F.3d 220, 231 (4th Cir. 2007) ("*Moussaoui II*") (exercising collateral-order jurisdiction over an appeal of a post-judgment order because "accepting jurisdiction over the appeal in no way prolongs the Government's prosecution of Moussaoui, who has already been sentenced").

of powers issues," which "are undoubtedly jurisprudentially important," especially because "disqualifying an entire United States Attorney's office is almost always reversible error."[2] But in other cases, even those implicating "substantial national security concerns," courts have declined to exercise interlocutory review. *See, e.g.*, *United States v. Moussaoui*, 333 F.3d 509, 516 (4th Cir. 2003) ("*Moussaoui I*") (declining to exercise interlocutory jurisdiction over Government's appeal from a pretrial order, despite "substantial national security concerns" implicated by the order).

**B.**

To exercise jurisdiction under the collateral-order doctrine, we must find that the District Court's order "conclusively determine[s] the disputed question, resolve[s] an important issue completely separate from the merits of the action, and [is] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 473 U.S. 463, 468 (1978). If the order fails to satisfy any of these requirements, it is not an appealable collateral order. *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 324 (3d Cir. 1999) (citation omitted).

---

[2]The majority also cites *United States v. Santtini*, 963 F.2d 585 (3d Cir. 1992), as a case in which we held that "interests asserted by the Government . . . are sufficiently important to merit interlocutory review." Maj. Op. 16. But in *Santtini*, we specifically "refrain[ed] from hearing the government's appeal under section 1291" because we found that the order underlying the Government's appeal did not satisfy all of the collateral-order doctrine's requirements. 963 F.2d at 592.

4

Construing these requirements strictly, as we must, I cannot agree with the majority that the order in this case "resolve[s] an important issue completely separate from the merits of the action." *Coopers & Lybrand*, 437 U.S. at 468. As the majority correctly points out, this requirement contains "'two sub-requirements: (a) the issue must be important; and (b) the issue must be completely separate from the merits of the action.'" Maj. Op. 15 (quoting *United States v. Wecht*, 537 F.3d 222, 230 (3d Cir. 2008)). Neither is met in this case.

First, it is not enough to conclude, in the abstract, that the Government's asserted interest is "important." To satisfy the collateral-order rule, we must satisfy ourselves that the Government's asserted right is "'important in a jurisprudential sense,'" i.e., important enough to "'overcome the policies militating against interlocutory appeals.'" *Praxis Props., Inc. v. Colonial Sav. Bank*, 947 F.2d 49, 56 (3d Cir. 1991) (citation omitted). Few issues satisfy this stringent test. Some violations of constitutional rights qualify, *see, e.g.*, *Wecht*, 537 F.3d at 231 (holding order restricting "the public's right of access to judicial proceedings" immediately appealable because that right "is a constitutional right of sufficient weight to permit the possibility of departing from ordinary final judgment principles" and "contemporaneous disclosure" of information pertaining to the trial would be lost if appeal were to be postponed); *Abney v. United States*, 431 U.S. 651, 660 (1977) (orders denying motions to dismiss on double jeopardy grounds are immediately appealable because "the rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence"), but others do not. Even

5

a defendant's right to interlocutory review is not automatic. For instance, despite the significance of the Sixth Amendment right to counsel, an order disqualifying defense counsel "lacks the critical characteristics" of jurisprudential significance to merit interlocutory review. *Flanagan*, 465 U.S. at 266. Similarly, a defendant cannot obtain interlocutory review by claiming a violation of the right to a speedy trial, *United States v. MacDonald*, 435 U.S. 850, 857 (1978), or a violation of grand jury secrecy rules, *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 800-02 (1989), notwithstanding the constitutional import of those rules.

In this case, the Government claims an interest that is of Congress's doing, 42 U.S.C. § 14135a(a)(1)(A), and is not "of constitutional stature." *Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 604 (1982). Though the Government's statutory authority to collect DNA samples from arrestees does, as the majority emphasizes, "'raise[] questions of clear constitutional importance,'" Maj. Op. 16 (quoting *Sell v. United States*, 539 U.S. 166, 176 (2003)), there is no long-standing recognition of this authority to collect DNA samples (forcibly, in some cases, *see* 42 U.S.C. § 14135a(a)(4)), analyze them, and retain them indefinitely. Moreover, the constitutional significance is of importance to the *defendant*, not the Government. No constitutional right is implicated by disallowing the taking of the defendant's DNA as occurred here.

The majority suggests that *Sell v. United States*, 539 U.S. 166 (2003), supports collateral-order jurisdiction over this case because of the constitutional importance of "the Government's interest in conducting reasonable searches for law enforcement purposes and individuals' rights to be free

from unreasonable searches." Maj. Op. 16. But *Sell* was not so broad. There, the Court upheld the exercise of collateral-order jurisdiction over an appeal *by the defendant* from a pretrial order permitting the Government to administer medication to a criminal defendant without his permission. The dispositive issue was that, by the time a post-judgment appeal could be filed, "Sell will have undergone forced medication – the very harm that he seeks to avoid." 539 U.S. at 176-77. Since "involuntary medical treatment raises questions of clear constitutional importance," interlocutory jurisdiction was appropriate. *Id.* at 176.[3] In *Sell*, unlike here, the defendant's rights were clearly at issue, and at risk.

Here, by contrast, even if the District Court's order is wrong on the merits, *no constitutional right will be forfeited if we do not exercise jurisdiction over the appeal*. The only harm will be to the Government's ability to take action prescribed by statute. The majority fails to recognize this in its cursory appraisal of jurisprudential importance. There is no "sever[e] . . . intrusion" upon the Government here, *see Sell*, 539 U.S. at 177; indeed, there is no intrusion upon the Government at all. The intrusion *upon Mitchell* would be of constitutional import, but the impact on the Government's statutory prerogatives is not. It also is of minimal practical significance. If Mitchell is convicted, the Government will have the undisputed right to collect his DNA. *See United States v. Sczubelek*, 402 F.3d 175, 187 (3d Cir. 2005). If he is

---

[3]Similarly, an order *allowing* the Government to collect a defendant's DNA by force under 42 U.S.C. § 14135a(a)(4)(A) would raise constitutional concerns that would warrant interlocutory review of an appeal by the defendant. But that is not the order before us in this case.

7

acquitted, he will be entitled by law to have the Government expunge his DNA profile from its CODIS database. 42 U.S.C. § 14132(d)(1)(A)(ii).

Second, the issue here is not completely separate from the merits of the prosecution. The majority dismisses Mitchell's concern in this regard by stating that "[n]othing in the record demonstrates that Mitchell's DNA will be an issue at trial or that the Government intends to compare Mitchell's DNA sample to DNA evidence collected from a crime scene. . . ." Maj. Op. 19. While that may be true, it ignores the fact that nothing *prevents* the Government from using Mitchell's DNA against him at trial. *See* 42 U.S.C. § 14132(b)(2)(C) (providing that DNA samples and DNA analyses may be disclosed "in judicial proceedings"). Indeed, the Government urges the Court to uphold the Government's right to collect a defendant's DNA before trial precisely *because* such evidence may prove useful to the prosecution of the crime for which the subject was arrested: "Collection of a defendant's DNA fingerprints at or near the time of arrest serves important purposes *relating directly to the arrest and ensuing proceedings*." Gov't Br. 40 (emphasis added); *see id.* at 40-41 (arguing that DNA collected before trial under § 14135a(a)(1)(A) "functions to aid the Government in" carrying its burden of proof by "identifying the defendant" and providing additional information about "what that person has done"). And the majority accepts the Government's argument in this regard, noting that the information coded in Mitchell's DNA has "important pretrial ramifications" and that the Government needs that information "as soon as possible" because "DNA profiling assists the Government in accurate criminal investigations and prosecutions," including in the "*investigation of the crime of arrest*." Maj. Op. 59

(emphasis added).[4] The Government's heightened interest in obtaining a defendant's DNA during the window of time between his arrest and his acquittal or conviction is based, at least in part, on its desire to use that DNA to help ascertain the defendant's identity as it relates to his guilt or innocence of the crime he is *currently* being charged with. Thus, I cannot agree with the majority that the question of the Government's right to collect Mitchell's DNA is "completely separate from the merits of the action" when a key reason for allowing the Government to collect Mitchell's DNA is the potential for the Government to uncover information it can use in investigating and prosecuting the "crime of arrest."

---

[4]In addition, at oral argument the Government was asked whether the DNA collected before trial would be used to aid judges in determining whether to release pre-trial detainees on bail. The Government replied in the affirmative. Indeed, one of the compelling interests identified by the Government is its interest in determining whether a person accused of a crime may have been involved in past criminal activity and, thus, may presently pose a danger to the community. If the arrestee's DNA profile were to reveal such a history, a judge would want to factor this into his bail decision, creating another link to the merits of a defendant's prosecution. *See United States v. Abuhamara*, 389 F.3d 309, 323 (2d Cir. 2004) ("Bail hearings fit comfortably within the sphere of adversarial proceedings closely related to trial . . . . [B]ail hearings, like probable cause and suppression hearings, are frequently hotly contested and require a careful consideration of a host of facts about the defendant and the crimes charged.").

Because this appeal does not "resolve an important issue" or pertain to an issue that is "completely separate from the merits of the action," and because we must interpret the collateral-order doctrine "with the utmost strictness" in this case, we lack jurisdiction over the Government's appeal. *Coopers & Lybrand*, 473 U.S. at 468; *Flanagan*, 465 U.S. at 266.

## II.

In addressing the merits, the majority concludes that "the latest and most wide-reaching federal DNA collection act," a statute that provides for the warrantless, suspicionless collection, analysis, and indexing of the DNA of federal arrestees and pretrial detainees – individuals who have not been convicted of a crime – does not present a Fourth Amendment problem. Maj Op. 21. I disagree. The majority's holding means that if a person is arrested for a federal crime in a case of mistaken identity (an all-too-common occurrence), the Government has the automatic right to sample the arrestee's DNA, to analyze it, and to include a profile derived from the DNA sample in CODIS. *See* 42 U.S.C. § 14135a(a)(1)(A), (b). Under the majority's holding, the arrestee has no way to protest or to prevent the Government from taking his DNA; his only recourse is to wait and later provide the Government with a "certified copy of a final court order establishing that" the charges against him have "been dismissed or [have] resulted in an acquittal," or that "no charge was filed within the applicable time period." *Id.* § 14132(d)(1)(A)(ii). Even then, although his DNA *profile* will be expunged from CODIS, the Government will retain his DNA *sample* indefinitely. I simply cannot

10

imagine that our Government can so easily override a person's expectation of privacy in his DNA.

The privacy interests of arrestees, while diminished in certain, very circumscribed situations, are not so weak as to permit the Government to intrude into their bodies and extract the highly sensitive information coded in their genes. Moreover, the Government's asserted interest in this case – the law enforcement objective of obtaining evidence to assist in the prosecution of past and future crimes – presents precisely the potential for abuse the Fourth Amendment was designed to guard against. Thus, arrestees' and pretrial detainees' privacy interests in their DNA are stronger, and the Government's interest in evidence collection for crime-solving purposes is less compelling, than the majority represents. After distinguishing our holding in *United States v. Sczubelek*, 402 F.3d 175 (3d Cir. 2005), I will address these interests in turn.

### A.

*Sczubelek*, which might appear to control this case, is readily distinguishable. There, we held that the collection and analysis of DNA samples from individuals convicted of certain qualified federal offenses do not violate the Fourth Amendment. *Id.* at 187. Thus, the key question in this case is whether Mitchell's status as an arrestee and pretrial detainee, as opposed to a convict, makes a difference that precludes the Government from sampling and analyzing his DNA. It does. The factors on both sides of the totality-of-the-circumstances equation are different for arrestees and pretrial detainees than for convicted felons: arrestees' and pretrial detainees' expectation of privacy in their DNA is greater, and the

11

Government's interests in accessing and analyzing that DNA are much less compelling.[5]

Convicts (whether prisoners or, as in *Sczubelek*, probationers) differ from arrestees and pretrial detainees in an obvious, but nonetheless critical, respect: they have been found guilty beyond a reasonable doubt, not just accused, of a crime. The conviction carries with it a permanent change in the person's status from ordinary citizen to "lawfully adjudicated criminal[] . . . whose proven conduct substantially heightens the government's interest in monitoring" him and "quite properly carries lasting consequences." *United States v. Kincade*, 379 F.3d 813, 836 (9th Cir. 2004) (en banc) (plurality op.). Thus, it comes as no surprise that our analysis in *Sczubelek* turned on the defendant's *conviction*, not his mere arrest, on federal felony charges. *See* 402 F.3d at 184-85 ("*After his conviction of a felony*, [defendant's] identity became a matter of compelling interest to the government . . . .") (emphasis added); *see also* Maj. Op. 49 (noting that our analysis in *Sczubelek* "relied heavily on Sczubelek's status as a convicted felon on supervised release"). Because they have not been adjudged guilty of any crime or suffered any corresponding permanent change in their status, arrestees and

_____

[5]I agree with the majority that, following *Sczubelek*, we must apply the "totality of the circumstances" test to determine the Fourth Amendment "reasonableness" of the contested search at issue in this case. Maj. Op. 32-33. But I share Judge McKee's concern that, when applied in these circumstances, such an analysis mimics a "special needs" analysis "while ignoring that the 'need' relied upon is law enforcement." *See Sczubelek*, 402 F.3d at 199-201 (McKee, J., dissenting).

12

pretrial detainees necessarily retain a greater expectation of privacy than convicts do.

At the same time, and as the majority concedes, several of the interests that tipped the balance in the Government's favor in *Sczubelek* do not carry the same force in this case. For example, "the interests in supervising convicted individuals on release and deterring recidivism," which we considered important in *Sczubelek*, 402 F.3d at 186, "do not apply to arrestees or pretrial detainees," Maj. Op. 56. The Government's interests in this case are limited by the fact that, unlike convicts, arrestees and pretrial detainees are entitled to a presumption of innocence. Thus, unlike in *Sczubelek*, the Government may not assume that the subjects of the DNA collection are more likely to commit future crimes to justify the collection and analysis of their DNA. *See United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) ("That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody."), *quoted in* Maj. Op. 60 n.25.

**B.**

Accordingly, *Sczubelek* does not control. Instead, our analysis must begin at the starting point for all Fourth Amendment inquiries: an assessment of the privacy interests at stake. *See United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

Arrestees and pretrial detainees do not forfeit their Fourth Amendment privacy protections simply by virtue of

13

being arrested. Courts have sanctioned government intrusion into those rights in only a few, narrow circumstances, such as searches of a suspect's person and the area within his immediate control incident to his arrest, *see, e.g.*, *Chimel v. California*, 395 U.S. 752, 763 (1969), and prison searches for the purpose of "maintaining institutional security and preserving internal order and discipline," *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979). Neither circumstance exists in this case, and the majority does not suggest otherwise. Instead, the majority premises its entire analysis on the theory that arrestees and pretrial detainees have a purported "diminished expectation of privacy in their identities." Maj. Op. 4. But this minimizes, and misses, the point, in three ways: (1) there is much more at stake in this case than arrestees' and pretrial detainees' expectation of privacy in their "identities"; (2) a person's DNA is not equivalent to his fingerprints; and (3) no persuasive authority supports the notion that arrestees and pretrial detainees enjoy less than a full expectation of privacy in their DNA.

Before assessing the privacy interest at issue here, it is important to clarify the nature of the intrusion that takes place when a DNA sample is taken from an arrestee or pretrial detainee. First, his cheek is swabbed. This is the initial search. The swab is followed by a taking – a seizure – of a sample of fluid containing DNA fluid. The seizure is then followed by another search of the DNA and the creation from the retrieved sample of a profile. And so, an arrestee or pretrial detainee undergoes *three* separate intrusions: the search of his mouth, followed by a seizure of fluid, which is then searched in order to extract the desired end product, the DNA profile.

14

**1.   This Case Does Not Merely Concern Arrestees' and Pretrial Detainees' "Identities."**

It is inaccurate to say that the only (or, indeed, even the primary) privacy concern at stake in this case is arrestees' and pretrial detainees' "identities."  The real purpose of collecting arrestees' and pretrial detainees' DNA samples and including the resulting DNA profiles in the federal CODIS database is not to "*identify*" the arrestee in the sense of allowing law enforcement to confirm that the correct person has been arrested or keeping records of who has been in federal custody, but to *use* those profiles and the information they provide as evidence in the prosecution and to solve additional past and future crimes.  *See* Gov't Br. 42-43 ("Collection of DNA fingerprints at the time of arrest or at another early stage in the criminal justice process can solve, prevent, and deter subsequent criminal conduct . . . ."); *see also* Maj. Op. 24 (noting that CODIS "'allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples . . . on file in the system'" (quoting H.R. Rep. 106-900(I), at 8 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2323, 2324)); Maj. Op. 59 ("Collecting DNA samples from arrestees can speed both the investigation of the crime of arrest and the solution of any past crime for which there is a match in CODIS."). Indeed, to my mind,"[t]he collection of a DNA sample . . . does not 'identify' an [arrestee or pretrial detainee] any more than a search of his home does – it merely collects more and more information about that [arrestee or pretrial detainee] that

15

can be used to investigate unsolved past or future crimes." *Kincade*, 379 F.3d at 857 n.16 (Reinhardt, J., dissenting).[6]

The structure of the statute and accompanying regulatory scheme confirm that the statute's animating purpose is not to identify the defendant. The statute provides for expungement of an arrestee's or pretrial detainee's DNA profile if the charges do not result in a conviction or if the Government fails to file charges within the applicable period. 42 U.S.C. § 14132(d)(1)(A)(ii). If the Government's real interest were in maintaining records of arrestees' identities, there would be no need to expunge those records upon an acquittal or failure to file charges against the arrestee. Indeed, this statutory provision serves as an admission that the fact of *conviction*, not of mere arrest, justifies a finding that an individual has a diminished expectation of privacy in his DNA.

Other features of the regulatory scheme further undermine the majority's conclusion that the relevant privacy concern here is arrestees' and pretrial detainees' expectation

---

[6]In *Sczubelek*, we used the concepts of "identity" and "identifying information" interchangeably. *See* 402 F.3d at 184-85 (reasoning that, because convicted offenders cannot assert a privacy interest in photographs and fingerprints as "means of identification" they also must forfeit their interests in the "identifying information" provided by their DNA). But I submit that there is an important distinction between these two concepts. It is the identifying information about the defendant, not his identity as such, that interests the Government in his DNA. Only through the use of that identifying information will additional crimes be solved.

of privacy in their "identities." The statute and regulations contemplate collection of a DNA sample and analysis of that sample to create a "DNA profile," which is then entered into CODIS.[7] The Government retains the full DNA sample indefinitely.[8] The arrestee's or pretrial detainee's intact, unanalyzed DNA sample contains a "'vast amount of sensitive information,'" Maj. Op. 42 (quoting *United States v. Amerson*, 483 F.3d 73, 85 (2d Cir. 2007)), beyond the individual's identity, including "familial lineage and predisposition to over four thousand types of genetic conditions and diseases" and, potentially, "genetic markers

---

[7]Although the majority considers the collection of the DNA sample and its subsequent analysis to create the DNA profile together, the majority and the Government acknowledge that both are constitutionally significant searches subject to Fourth Amendment scrutiny. Gov't Br. 21-22; Maj. Op. 35-36; *see also Sczubelek*, 402 F.3d at 182 (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989)). As discussed above, three separate instances of search or seizure occur throughout the DNA collection and analysis process authorized by 42 U.S.C. § 14135(a)(1)(A).

[8]The statute provides for the expungement of DNA *profiles* from CODIS under certain circumstances, *see* 42 U.S.C § 14132(d)(1), but does not provide any mechanism for the disposal of the DNA *samples*. The Government states that, "if the conditions for expungement of a DNA profile under § 14132(d)(1) are satisfied, the FBI disposes of the DNA sample from which it was derived as well," Gov't Reply Br. 22, but does not cite any authority to support that assertion.

17

for traits including aggression, sexual orientation, substance addiction, and criminal tendencies," *United States v. Mitchell*, 681 F. Supp. 2d 597, 608 (W.D. Pa. 2009) (citation omitted). The majority suggests that the "possible misuse and future use of DNA samples" is a matter of conjecture, Maj. Op. 45, but that seeks to divert from the issue at hand. Misuse and future use notwithstanding, the Government has taken, searched, and retained rich, privacy-laden DNA in the sample. The majority's focus on the Government's *use* of that DNA as the controlling privacy consideration is simply misguided. It is akin to saying that if the Government seizes personal medical information about you but can only use the subset of that information that serves to identify you, your privacy interest in the information taken is confined to a mere interest in your identity. Nothing could be further from the truth, and the majority engages in sleight of hand by suggesting otherwise.

The majority does not even attempt to support its thesis that arrestees and pretrial detainees have a diminished expectation of privacy in this extremely private and sensitive information. Instead, it avoids this issue by theorizing that statutory safeguards concerning the post-collection use of the samples validate, or justify, their earlier warrantless collection. Maj. Op. 42-44. But where in our jurisprudence have we held that post-collection safeguards on the *use* of seized material can immunize an otherwise impermissible *search*? It bears repeating that a seizure and two invasive searches have already taken place before any question of the DNA sample's *use* even comes into play. The majority's emphasis on *use* to define – in fact, to cabin – the nature of the interest is not supportable in law or logic.

18

With these concerns in mind, it is little comfort that only so-called "junk DNA" is used to compile a suspect's DNA profile.  As our colleagues from the Ninth Circuit Court of Appeals have pointed out, "with advances in technology, junk DNA may reveal far more extensive genetic information."  *United States v. Kriesel*, 508 F.3d 941, 947 (9th Cir. 2007).  Indeed, studies already "have begun to question the notion that junk DNA does not contain useful genetic programming material," *Kincade*, 379 F.3d at 818 n.6 (plurality op.) (citation omitted); *see also id.* at 849-50 (Reinhardt., J., dissenting) (citing additional studies).  Contrary to the majority, which dismisses these concerns as "hypothetical possibilities . . . unsupported by the record before us," Maj. Op. 45, we believe we should not be blind to the potential for abuse when assessing the legitimacy of government action.   These concerns are legitimate and real, and should be taken into account in considering the totality of the circumstances in this case.

## 2. DNA Is Not the Same as Fingerprints or Photographs.

Taking an arrestee's picture or fingerprints does not provide a useful analogy for analyzing the question of whether the Government may collect and analyze his DNA.  *See* Maj. Op. 46-53.  To the contrary, "[t]he seizure and indefinite storage of the [DNA] sample, which is what . . . the government must justify under a Fourth Amendment exception, is very different from fingerprinting and other traditional booking procedures."  *See United States v. Pool*, 621 F.3d 1213, 1238 (9th Cir. 2010) (Schroeder, J., dissenting).

For one thing, collecting and analyzing DNA is much more intrusive than either fingerprinting or photographing. As noted above, the DNA samples the Government seeks to extract contain far more than the mere identifying information that can be gleaned from a suspect's fingerprints or mug shot. And whereas the science surrounding DNA is still evolving (and may even be said to be in its early stages), we know that the potential to use fingerprints and mug shots for purposes other than identification is limited. Moreover, and quite obviously, the collection of a person's DNA "'*requires production of evidence below the body surface which is not subject to public view*,'" whereas fingerprinting and photographing do not. *Sczubelek*, 402 F.3d at 197-98 (McKee, J., dissenting) (quoting *In re Mills*, 686 F.2d 135, 139 (3d Cir. 1982) (emphasis added)). While the Supreme Court, and we, have held in some circumstances that blood tests or other bodily intrusions constitute a *"minimal" invasion* of an individual's privacy interests, *see* Maj. Op. 34-35 & cases cited therein, we should not dismiss any such intrusion lightly, *cf. Schmerber v. California*, 384 U.S. 757, 770 (1966) ("The importance of informed, detached and deliberate determinations of the issue of whether or not to invade another's body in search of evidence of guilt is indisputable and great."); *Sczubelek*, 402 F.3d at 184 (noting that even the "slight intrusion" of a blood test is "unconstitutional" when required of "an ordinary citizen").

At the same time, the Government's interest in collecting fingerprints and photographs is stronger than its interest in collecting and analyzing DNA. In the case of photographs and fingerprints, the Government's primary interest is to "identify" suspects in the traditional sense, i.e., to "ensure[] that the person who has been arrested is in fact

the person law enforcement agents believe they have in custody." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1113 (10th Cir. 2006). But with respect to DNA, the Government's primary objective is to solve crimes. I agree with the majority that the Government's interest in identifying individuals who have been arrested can be strong; where we part company is in the majority's conclusion that it justifies the warrantless collection and analysis of DNA, which contains much more than just identifying information.

### 3. No Persuasive Authority Supports the Conclusion that Arrestees and Pretrial Detainees Have a Diminished Expectation of Privacy in Their DNA.

Even if arrestees' and pretrial detainees' expectation of privacy in their identities were the relevant privacy interest in this case, the caselaw concerning arrestees' and pretrial detainees' reduced expectation of privacy in their identities is not nearly as broad or clear-cut as the majority suggests.

The majority relies heavily on cases that approve the use of fingerprinting arrestees and pretrial detainees as part of routine "booking procedures." *See* Maj. Op. 49-52. Fingerprinting does not provide a useful analogue in this case for the reasons outlined above. Even leaving that aside, however, I disagree that the "booking procedures" cases carry the weight the majority assigns to them. As the majority concedes, most modern cases on the subject "assume the propriety of such booking procedures with little analysis." Maj. Op. 49 n.20; *see, e.g.*, *Smith v. United States*, 324 F.2d 879, 882 (D.C. Cir. 1963) ("[I]t is elementary that a person in lawful custody may be required to submit to photographing . .

21

. and fingerprinting . . . as part of routine identification processes." (citations omitted)).  That is particularly true of cases that proclaim that the Government has an interest in using those fingerprints for solving past and future crimes unrelated to the suspect's arrest – they tend simply to state that "we accept" those practices as a truism, without any further citation or analysis.  *See, e.g.*, *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992) (stating, without citation to authority, "[w]e accept" routine fingerprinting "because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes").

Where courts analyze the reasons we allow routine fingerprinting in any detail, they typically rely on one of two justifications:  (a) that the evidence may be used to solve the particular crime for which the government has probable cause to arrest the suspect or (b) that the Government has a general interest in what the majority describes as the first "component" of a person's identity  –  "'who that person is.'"[9]  Maj. Op. 59 (quoting *Haskell v. Brown*, 677 F. Supp.

---

[9]The Supreme Court employed the former justification in *Hayes v. Florida*, 470 U.S. 811 (1985) (cited in Maj. Op. 51), when it expressed support "for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, *if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime*, and if the procedure is carried out with dispatch," *id.* at 817 (citation omitted) (emphasis added).  *United States v. Olivares-Rangel*, 458

22

2d 1187, 1199 (N.D. Cal. 2009)). Both justifications make sense and may be true in a limited context, but neither one explains why the Government may collect identifying information expressly for the purpose of using it against arrestees in connection with other, unsolved crimes for which the Government has no basis to suspect the arrestee.

The majority seems to take additional comfort in the Ninth Circuit Court of Appeals' recent holding in *United States v. Pool*, 621 F.3d 1213 (9th Cir. 2010),[10] that a judicial or grand jury determination of probable cause that an individual has committed a crime provides a "legitimate reason" for finding that pretrial releasees have a diminished expectation of privacy in their DNA. Maj. Op. 30-32; *see also Pool*, 621 F.3d at 1220 ("[I]t is doubtful that Pool, or any other individual having been indicted by a grand jury or having been subjected to a judicial determination of probable

F.3d 1104 (10th Cir. 2006), provides a good example of the latter justification. In that case, the court explained, "[f]ingerprinting ensures that the person who has been arrested *is in fact the person law enforcement agents believe they have in custody*," and "[t]he government always has the right, and indeed the obligation, *to know who it is that they hold in custody* regardless of whether the arrest is later determined to be illegal," *Id.* at 1113 (emphases added).

[10]As the majority noted, the Ninth Circuit voted on June 2, 2011 to rehear *Pool* en banc. In granting rehearing, the Ninth Circuit ordered that the three-judge panel opinion shall not "be cited as binding precedent by or to any court of the Ninth Circuit." *United States v. Pool*, --- F.3d ---, 2011 WL 215102, at *1 (9th Cir. June 2, 2011).

23

cause, has any right to withhold his or her true identification from the government.").

I do not find the reasoning of *Pool* to be applicable here. As an initial matter, *Pool* "condones DNA testing for individuals for whom a judicial or grand jury probable cause determination has been made; it does not address such sampling from mere arrestees." *Id.* at 1231 (Lucero, J., concurring). The majority glosses over that distinction, announcing the much broader holding that the probable-cause requirement "inherent in the statute," which presumably incorporates an arresting officer's finding of probable cause in addition to findings by a judge or grand jury, is enough to support a diminution in an arrestee's or pretrial detainee's expectation of privacy in his DNA. *See* Maj. Op. 53 n.22. The majority never explains why that is the case.

Moreover, *Pool*, like most fingerprinting cases, never explains why a finding of probable cause in connection with a particular crime justifies the collection of DNA profiles for use in connection with *other* crimes for which, by definition, there has been no finding of probable cause or, indeed, any suspicion at all. I am not persuaded by the concurring opinion's reasoning that a prior "probable cause determination limits the opportunities for mischief inherent in a suspicionless search regime." *Pool*, 621 F.3d at 1231-32 (Lucero, J., concurring). We do not view a finding of probable cause for one crime as sufficient justification to engage in warrantless searches of arrestees' or pretrial detainees' homes for evidence of other crimes, *see, e.g.*, *Chimel*, 395 U.S. at 763 (holding that, absent a search warrant, there is "no . . . justification" for searching an area not within a suspect's immediate control during an arrest), or

24

even for purposes of identification, *see, e.g.*, *Hayes*, 470 U.S. at 817 ("[N]either reasonable suspicion nor probable cause would suffice to permit . . . officers to make a warrantless entry into a person's house for the purpose of obtaining fingerprint identification").  Indeed, even after *conviction*, warrantless searches raise serious Fourth Amendment questions.  Where the Supreme Court has upheld such searches, it has focused on non-law enforcement "special needs," as in *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987), or "reasonable suspicion" that the subject of the search "is engaged in criminal activity," as in *United States v. Knights*, 534 U.S. 112, 121 (2001).  Neither circumstance exists in this case.

In light of the foregoing, I do not find any authority to support a general diminution of arrestees' or pretrial detainees' privacy interests by virtue of a finding of probable cause.  Absent such authority, there is no basis for concluding that arrestees' or pretrial detainees' expectation of privacy in their DNA is diminished in any way.

## C.

Acknowledging that the Government's interests in "supervising convicted individuals on release and deterring recidivism do not apply to arrestees or pretrial detainees," the majority rests its approval of the DNA collection scheme at issue here entirely on the Government's interest in "collecting identifying information to aid law enforcement."  Maj. Op. 56.  In so doing, the majority seems to have lost sight of the Fourth Amendment's inherent strictures.

25

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV. "Ordinarily, the reasonableness of a search depends on governmental compliance with the Warrant Clause, which requires authorities to demonstrate probable cause to a neutral magistrate and thereby convince him to provide formal authorization to proceed with a search by issuance of a particularized warrant." *Kincade*, 379 F.3d at 822 (plurality op.) (citation omitted).

Throughout the years, courts have approved exceptions to the warrant and probable-cause requirements in certain carefully defined circumstances, such as searches incident to arrest, *see, e.g.*, *Chimel*, 395 U.S. at 763, limited, protective searches based on "reasonable suspicion" of imminent danger, *e.g.*, *Terry v. Ohio*, 392 U.S. 1, 27 (1968), and generalized prison searches to further legitimate penological goals, *e.g.*, *Florence v. Burlington Cnty.*, 621 F.3d 296, 307 (3d Cir. 2010) (holding certain jails' strip-search procedures reasonable in light of the jails' interests in maintaining security). *See generally Kincade*, 379 F.3d at 822-24

(surveying exceptions to warrant and probable-cause requirements). But, given the express warrant and probable-cause requirements in the Fourth Amendment's text, we must take special care when approving warrantless, suspicionless searches to ensure that our analysis is well grounded in the facts and law and that it makes jurisprudential and common sense.

Our task in Fourth Amendment cases is not to determine whether some asserted government interest might theoretically provide a rational basis for the challenged search. The majority's conclusion that the government interest here is somehow sufficient does just that, and thereby transforms the analysis into one that is more akin to First Amendment reasoning.[11] But there is no "rational basis" principle in our Fourth Amendment jurisprudence.

The Supreme Court historically has regarded generalized interests in "law enforcement" as a particularly suspect type of government interest for Fourth Amendment purposes, and has specifically held invalid other suspicionless search programs that are designed to "uncover evidence of ordinary criminal wrongdoing" by the targets of the search. *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000); *see also, e.g.*, *Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001) (invalidating hospital program, developed with police

---

[11]In First Amendment cases, our task is first to determine whether the challenged government action infringes a fundamental right protected by the Amendment. If the statute does not do so, the federal or state government "need only demonstrate a rational basis to justify" it. *Ysursa v. Pocatello Educ. Ass'n*, 129 S. Ct. 1098, 1098 (2009).

involvement, of drug testing pregnant women and turning over evidence of drug use to law enforcement for use in prosecutions because "the immediate objective of the searches was to generate evidence *for law enforcement purposes*") (emphasis in original); *see generally Sczubelek*, 402 F.3d at 190-97 (McKee, J., dissenting) (providing comprehensive overview of Supreme Court precedent in this area); *Kincade*, 379 F.3d at 854 (Reinhardt, J., dissenting) ("Never once in over two hundred years of history has the Supreme Court approved of a suspicionless search designed to produce ordinary evidence of criminal wrongdoing by the police."); *cf. Illinois v. Lidster*, 540 U.S. 419, 423-24 (2004) (holding that searches or seizures designed to elicit information about a particular crime "in all likelihood committed by others" are constitutional, unlike those designed to determine whether the particular individuals stopped are "committing a crime").[12] This treatment

---

[12]The Second Circuit Court of Appeals held that *Lidster* supports its determination that a New York DNA collection statute does not violate the Fourth Amendment, classifying the DNA collection program as an "information-seeking," rather than a "crime detection" search. *Nicholas v. Goord*, 430 F.3d 652, 668-69 (2d Cir. 2005). Respectfully, I disagree. Unlike in *Lidster*, where the Court stressed that the search sought information from "members of the public for their help in providing information about a crime in all likelihood committed by others," 540 U.S. at 423, the scheme at issue in this case searches arrestees for the very purpose of determining whether *they* – not "others" – are "possibly implicated in other crimes," Maj. Op. 59. The vast program of DNA profiling at issue in this case cannot be characterized as simply "information-seeking," and neither the Government

28

comports with basic notions of the role the Fourth Amendment plays in protecting the lives of ordinary citizens. *See, e.g.*, *Kincade*, 379 F.3d at 851-52 (Reinhardt, J., dissenting) ("[The Framers] knew that the use of suspicionless blanket searches and seizures for investigatory purposes would 'subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention.'" (quoting *Davis v. Mississippi*, 394 U.S. 721, 726 (1969)).

The majority ignores all of this context and accepts at face value the notion that the public interest in prosecuting crime is a "key interest" that, without more, justifies the Government's collection and analysis of arrestees' and pretrial detainees' DNA. *See* Maj. Op. 56-61. However, in light of the Fourth Amendment's text and the Supreme Court's guidance in interpreting it, the Government's interest in evidence-gathering and crime-solving deserves little or no weight in our Fourth Amendment review. Even were we to assume some diminution in arrestees' and pretrial detainees' expectation of privacy in their DNA, the Government cannot trump that expectation simply by invoking its interest in solving crimes.

---

nor the majority even attempts to justify it on that ground. Instead, like the program the Supreme Court declared unconstitutional in *Edmond*, the Government's DNA collection and analysis program here is justified "only by the generalized and ever-present possibility that" including the seized DNA in CODIS "may reveal that any given [arrestee or pretrial detainee] has committed some crime." 531 U.S. at 44.

Of course, the Government's interest in solving past and future crimes is a legitimate and serious one. But if that were our only concern, we would authorize the collection and inclusion in CODIS of DNA profiles of every citizen – surely, that would "assist[ ] the Government in accurate criminal investigations and prosecutions." Maj. Op. 59. Similarly, if we hold that this interest prevails over some inchoate "diminished expectation of privacy," then we may be opening the door to the collection and analysis of DNA for crime-solving purposes from the "many other groups of people who," under Supreme Court precedent, "have a reduced expectation of privacy," including, *e.g.*, "students who attend public schools and participate in extracurricular activities" and "drivers and passengers of vehicles." *Sczubelek*, 402 F.3d at 198-99 (McKee, J., dissenting) (citations omitted); *see also Kincade*, 379 F.3d at 844 (Reinhardt, J., dissenting) ("Under the test the plurality employs, any person who experiences a reduction in his expectation of privacy would be susceptible to having his blood sample extracted and included in CODIS – attendees of public high schools or universities, persons seeking to obtain drivers' licenses, applicants for federal employment, or persons requiring any form of federal identification, and those who desire to travel by airplane, just to name a few."). Routine searches of arrestees' homes would also be permitted as furthering the Government's legitimate crime-solving interests.

The absurdity of these examples underscores that the Government's crime-solving interests, while compelling in the abstract, cannot carry the day here. Warrantless searches require so much more. I do not agree with the majority that arrestees' and pretrial detainees' expectation of privacy in

30

their DNA yields so easily to the Government's generalized evidence-collection and crime-solving concerns.

**D.**

It should also be noted that the Court has before it a facial challenge to § 14135(a)(1)(A) and its implementing regulation, 28 C.F.R. § 28.12, not an as-applied challenge. The statute and the regulation are unconstitutional on their face, satisfying even the most stringent standard for a facial challenge. This standard, announced in *United States v. Salerno*, 481 U.S. 739, 745 (1987), requires that the party asserting the challenge "must establish that no set of circumstances exists under which the Act would be valid."[13]

---

[13]In reciting this test for a facial challenge, the majority fails to mention the uncertainty of its continuing vitality. In *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999), a plurality of the Court explained that, "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision in this Court, including *Salerno* itself." *See also Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring) ("I do not believe the Court has ever actually applied such a strict standard [as no set-of-circumstances], even in *Salerno* itself, and the Court does not appear to apply *Salerno* here."). Most recently, the Court has analyzed facial challenges under both the *Salerno* standard and the less rigorous rule "that a facial challenge must fail where the statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotation marks and citations omitted) (noting that "some Members of the Court have criticized the

31

The test is met here.  No set of circumstances exists under which a statute and regulation mandating DNA collection for *all* arrestees and pre-trial detainees can be constitutionally valid.

The majority approaches the apparent ambiguity in the nature of Mitchell's challenge by, it says, considering both an as-applied and a facial challenge to the statute.  However, what it refers to as its analysis of Mitchell's "as-applied" challenge is, in fact, an analysis of whether the statute is constitutional on its face.  In balancing Mitchell's and the Government's interests, the majority speaks in sweeping and general terms.[14]  Aside from a few semantic nods, nothing in

*Salerno* formulation" and holding that Washington state law governing primary elections "survives under either standard.").  Mitchell's challenge meets the Court's most exacting standard, but it is unclear whether that is even required for him to prevail.

[14] For example, it describes the intrusions at issue as "the act of collecting DNA" and "the processing of the DNA sample and creation of the DNA profile for CODIS," not as collecting a particular person's DNA under particular circumstances.  Maj. Op. 42.  It finds that Mitchell's privacy argument is unavailing "in light of the restrictions built into the DNA profiling process," suggesting that the process writ large – not the particular process that Mitchell underwent – is constitutionally sound.  Similarly, it explains the Government's interests in general terms.  The Government's alleged interest in identifying arrestees, the majority says, justifies the statute itself, not the statute as it is applied to Mitchell.  Maj. Op. 56-61.

its "as applied" analysis looks at the DNA Act as applied to Mitchell in particular. Instead, it evaluates the general question of whether it is constitutional to collect DNA from federal arrestees and pretrial detainees. *See United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack . . . does not contend that law is unconstitutional as written but that its application to a particular person under particular circumstances deprives that person of a constitutional right."). The majority concludes from this analysis that 42 U.S.C. § 14315(a) is constitutional as applied to Mitchell and, therefore, as this represents a circumstance in which the statute can be applied constitutionally, that Mitchell cannot meet the "no set of circumstances" test for a facial challenge. Maj. Op. 61-62. The majority's mislabeling of its facial analysis as an as-applied analysis is, thus, inconsequential in the end, but nonetheless perplexing. As an effort to confine its far-reaching holding, it fails.

Regardless of how Mitchell's challenge to 42 U.S.C. § 14315(a) was formulated, the statute and its implementing regulation are facially unconstitutional. They require warrantless, suspicionless collection of DNA from the bodies of *all* arrestees and pre-trial detainees. There is no set of circumstances under which this requirement, i.e., that *all* arrestees are to be swabbed, can be said to be constitutional. Its blanket mandate contradicts basic and essential Fourth Amendment principles.

Accordingly, I respectfully dissent, as I would affirm the District Court's order.